STATE OF NEBRASKA, APPELLANT, v. EMPLOYERS OF LABOR ET AL., APPELLEES.

FILED NOVEMBER 30, 1918.    No. 20451.

1. **Monopolies: EMPLOYERS AND EMPLOYEES: RIGHT TO ORGANIZE.** Employers of labor and workingmen have equal rights to form organizations for their own personal benefit, and, in the absence of a contract for a fixed term of employment, the employer may discharge the employee, or the employee may quit his employment at his own pleasure.

2. ———: **EMPLOYEES: RIGHT TO ORGANIZE.** There is no law to prevent employees from combining to improve their working conditions, or to raise their general standard of living, or to procure shorter hours of labor and higher wages, or for any other lawful or useful purpose.

3. **Torts: REFUSAL TO WORK: RIGHTS OF EMPLOYEES.** In the absence of a contract for a fixed term of employment, employees have a right to refuse to work, if they believe such refusal will aid them in accomplishing such objects, and for that purpose, in a legal and proper manner, they have a right to persuade other workmen to cease work, or to employ any other legal means which will aid them in attaining their end.

4. **Injunction: LABOR DISTURBANCES.** The relations between capital and labor, as the law now stands, cannot be controlled or regulated by injunction. The extraordinary writ of injunction, how-

ever, may properly be granted by a court of equity when property or personal rights are unlawfully assailed.

5. ———: ———: INTERVENTION RY STATE. Ordinarily the state will not interfere in private controversies between employers of labor and men in their employment.

6. ———: ———: ———. While the attorney general is not authorized to bring an action in the name of the state, in ordinary labor disputes, he may, under the present statute (sections 4045, 4066, Rev. St. 1913), bring an action in the name of the state to restrain wilful and illegal acts affecting the public generally, which directly operate in restraint of trade and commerce, and such an action may be maintained regardless of the motives of those who violate the law.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Affirmed.*

*Willis E. Reed, Attorney General, Alfred C. Munger, Norris Brown* and *D. M. Vinsonhaler,* for appellant.

*Frank H. Gaines, Francis A. Brogan* and *Anson H. Bigelow, contra.*

LETTON, J.

In May, 1917, certain industrial disturbances took place in Omaha, finally culminating in interference with the comfort and welfare of large classes of the community, and in lockouts, strikes, disorderly assemblages, assaults, and damage to property. Prior to that year it had been customary in that city for certain trades to make collective agreements through labor unions with associations of employers in such trades, but the practice was stopped by the employers, and it was sought by some of them to have their workers sign an agreement in part as follows:

"I agree to work under 'open shop' principle, under which employees are to be selected and retained regardless of whether they do or do not belong to any labor organization, and I will not leave my work on account of the employment of union or nonunion men, either in my line of work or trade, or in any other."

102 Neb.—49

"I will not refuse to handle material of any kind, regardless by whom made or delivered, nor will I participate in any sympathetic or jurisdictional strike affecting your business."

A business men's association was formed in the city, which seems to have had some influence in preventing trade agreements such as had been formerly made, and in endeavoring by means of the pledge to make the "open shop" principle prevail in Omaha. Either before or after this —the evidence as to this is not quite clear, though the unions assert it was afterwards—the labor unions attempted to establish the "closed shop," and a number of strikes resulted on account of the failure of employers to discharge workers who refused to join a labor union. A strike of the teamsters in one of the building material and coal yards in the city led to a general teamsters' strike where nonunion men were employed. Some of the men were assaulted while delivering coal, a lockout followed in all the fuel and material yards, and the owners and managers refused to sell fuel and building material to the public generally, and thus interfered with the conduct of building operations and caused the idleness of building craftsmen. In fact, conditions were becoming chaotic, and disorders and breaches of the peace were occurring, when this action for an injunction was brought by the attorney general of the state against all employers of labor, both members and nonmembers of the business men's association of Omaha, and against a large number of labor unions and their officers within the city. A temporary, and afterwards permanent, injunction was granted against the owners of coal and building material yards in the city, enjoining the closing of yards. An injunction was also granted against Teamsters Union No. 211, enjoining it and its members from interfering with, assaulting, threatening or intimidating nonunion teamsters within the city. From the refusal

to enjoin the other defendants, the attorney general appeals. The teamsters union has filed a cross-appeal against the order allowing an injunction against it.

The prayer of the petition is lengthy. In substance it prays that the Omaha business men's association, and all employers of labor in the city, be enjoined from committing any acts in restraint of trade, transportation or commerce, or conspiring so to do, and from punishing any of its members for failure to continue to co-operate with it; that the owners of coal and building yards in the city be enjoined from refusing to sell their goods to any one who is willing to pay the price for same; that the labor unions and their officers be enjoined from agreeing to refuse to transport any commodity in the usual course of trade, from carrying on any unlawful business, from picketing, threatening, intimidating, or interfering with any individual in performing lawful work, or from seeking to require any individual to join a union, and "that the question of union or nonunion shops, whether advocated or contended for or against, by any of the defendants herein, be held in abeyance until the close of the present war."

The district court enjoined the owners of coal and building material yards from conspiring to close and closing their places of business, and refusing to sell coal and building material to the public. No complaint is made as to the justness of this decree, and it will not be further noticed.

The questions raised by the appeal of the attorney general are whether the district court was justified in refusing to grant an injunction against the business men's association, and the employers of labor generally, and also in refusing to grant an injunction against the defendant labor organizations and their officers, other than the teamsters union. The remaining questions are raised by the cross-appeal of the teamsters union.

In support of the appeal, the attorney general argues
at length a number of sound legal propositions. The
serious question in this case is whether the facts in
evidence bring the case within these principles. One
purpose of the suit seems to be to enjoin the employers
from forming an association which was trying to com-
pel an "open shop" condition in the city, and to en-
join the labor unions from striving to compel a "closed
shop" condition.

Both employers of labor and working men may form
organizations for their own personal benefit. Their right
to form and organize associations is the same. That
which is lawful for the employer is lawful for the em-
ployees. If there is no contract for any fixed term of
employment, the employer may discharge, or the em-
ployee stop work, at his own pleasure. *National Pro-
tective Ass'n v. Cumming*, 170 N. Y. 315, 58 L. R. A.
135.; Martin, Modern Law of Labor Unions, sec. 27.

In such a case there is no law which prevents work-
ingmen from combining for the purpose of improving
working conditions, raising their general standard of
living, procuring shorter hours of labor and higher
wages, or for any other lawful and useful purpose.
They have a right to refuse to work if they believe this
will aid them in accomplishing their object. They have
a right also for that purpose to persuade other work-
men to cease work, in a legal and proper manner, and
to employ any other lawful means which will aid them
in attaining their end.

On the other hand, employers may legally agree with
each other that they will not adopt the "closed shop"
principle, but will require any man employed to work
upon the "open shop" principle, or may counsel and
advise with each other for that purpose. They have
as much legal right to refuse to employ members of
labor unions as such members have to refuse to work in
an "open shop," and the same legal right to adopt a

course of conduct in concert. *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229; 38 Sup. Ct. Rep. 65; Martin, Modern Law of Labor Unions, sec. 270.

Of the moral aspect of the respective legal rights to combine, we cannot take note in such a proceeding. A better time may come, when a better understanding of the fact that, properly considered, the welfare of both laborer and employer is to the common interest of both, and when co-operation instead of conflict may reconcile the differences between capital and labor, so that each may have its fair and just share of the proceeds of their joint enterprise. As the law now stands, we can only administer it as we find it, and endeavor to protect the legal rights of each alike.

At common law it was an actionable wrong for one to attempt to entice away or interfere with the servant of another, and to induce such persons to leave their employment was actionable, if done maliciously and without justifiable cause. *Truax v. Raich,* 239 U. S. 33. Many cases may be found in books to this effect, but these principles do not apply in this case.

No direct evidence has been called to our attention where a deliberate effort was made maliciously to interfere with existing contracts of employment. A few instances of interference with electrical work performed by nonunion workers were shown, but the evidence is not sufficient to warrant an injunction against the electrical workers union on that account, and in fact such an injunction, it is said in the brief, was denied in a suit for that purpose. It may be that in the great mass of testimony some instance has escaped us where a contract relation existed, or malice was shown; but, if so, that fact, while perhaps affording an action for damages to the person whose rights were affected, would not warrant granting such an injunction as is asked for in this suit. While relief by injunction will be granted in proper cases by the courts, it is not their

function to attempt to regulate by such process the relations between capital and labor. It is only when property or personal rights are assailed that the courts interfere.

Viewed in the light of these legal principles, we conclude that the evidence as to the Omaha business men's association, and as to employers of labor generally, does not warrant the granting of an injunction against them.

The same considerations apply with respect to the injunction sought against the labor unions and their respective officers, with the exception of the teamsters union. In the main, the acts in evidence with respect to the action of these defendants show simply a refusal by members of these unions to work upon the same job with nonunion men, and peaceable efforts by union members to induce other workers to join the union in their respective crafts.

Taken as a whole, there is not sufficient evidence to sustain the sweeping and blanket injunctions sought by the attorney general in behalf of the state. These considerations dispose of the appeal of the state.

There remains to be considered the cross-appeal of the teamsters union. The appeal of the teamsters union is based upon four propositions, three of which merit consideration: (1) The conspiracies sought to be restrained are not within the purview of the statute under which the action is brought. (2) The evidence is not sufficient to sustain a finding of a conspiracy, or combination in restraint of trade. (3) The attorney general is without authority to bring such an action.

It is asserted by the teamsters union that this is an action under the provisions of sections 4045, and 4066, Rev. St. 1913, commonly known as the "Junkin Act;" that such act does not apply to labor organizations; and that the attorney general has no power or author-

ity under its provisions, or at common law, to maintain such an action.

The argument is that, since labor organizations or combination of labor were exempted from the operation of the Gondring Act (Laws 1897, ch. 79), as formerly held by this court, and since the Junkin Act (Laws 1905, ch. 162, which is the present statute), under the decision in *State v. Omaha Elevator Co.*, 75 Neb. 637, must be construed as a single statute with the Gondring Act, so far as not repealed by implication, it cannot apply to the facts in this case, and the attorney general is not authorized under its terms to maintain such an action. It was held in the case mentioned that, since a "trust" was not defined in the Junkin Act, and there was no expressed repeal of the Gondring Act, recourse might be had to the first section of that act for the legislative definition of a "trust." While this is so, it is not a "trust" that is complained of here, but a "conspiracy in restraint of trade or commerce," which requires no definition other than that furnished by the common law, and hence no reference to the former act is necessary, nor are its terms material in this respect.

It is also contended that the attorney general has no power to bring the action in the district court; that he can only act in such court through the county attorney; and that the supreme court is the only forum in which he can bring and maintain an action as the law officer of the state. The statute declares: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal." Rev. St. 1913, sec. 4045. By section 4066, Rev. St. 1913: "It is hereby made the duty of the attorney general and the county attorney of each county under the direction of the attorney general to institute and prosecute such proceedings as may be necessary to carry into effect all of the provisions of this article." This is sufficient

to confer power upon that officer to maintain a suit to enjoin such a conspiracy in restraint of trade or commerce, and if the evidence clearly shows unlawful acts directly affecting trade and commerce, grave in their nature, and to such an extent as to interfere with the public generally, to justify a decree. Under the present statute, unlike the statute under which the earlier cases in this state were decided, the prohibition applies to any and all persons who may create such unlawful conditions, regardless of the class to which they may belong, or the motive for the acts. This is in line with the federal cases construing the Sherman Act, of which this statute is a copy.

It is obvious that the state has no concern with the ordinary relations between employer and employee. It may, in the exercise of the police power and in the interests of the public health and safety, provide for special hours of labor as to certain classes of individuals and in certain callings, it may regulate safety appliances to be installed by the employer for the protection of the health or safety of the workers, but it cannot, unless as a part of its punitive functions, compel one man to work for another against his will. Nor has it, or its law officer, the right to interfere in ordinary labor disputes.

The proper limits of this opinion do not permit a detailed statement of the evidence, but it is clear that the transportation of fuel and other articles was so interfered with as to constitute a restraint of trade and commerce.

We are convinced that the evidence sustains the finding that the teamsters union and its members conspired together to prevent the transportation of goods and merchandise within the city by assaults, threats, and other disorderly conduct. The evidence as to this is in sharp conflict, but the circumstantial evidence and the general situation which the record discloses

with respect to the obstruction of commerce and interference with the attempted delivery of goods by nonunion teamsters is such as to convince an unprejudiced mind that the illegal acts occurred by reason of a concert of action instigated by the men directly connected with and in control of the organization.

On the whole case, we find no reason for interfering with the judgment of the district court, and it is therefore

AFFIRMED.

ALDRICH, J., not sitting.

CORNISH, J., dissenting.

Whether either labor unions or employers of labor are subject to injunction, at the suit of the other, for violation of the other's rights, is one question. Whether either is so subject in a suit, brought by the attorney general in behalf of the state, in Douglas county, is another question. For myself, I question the state's action as against either of these defendants. The opinion appears to base the state's right of action upon the provisions of the statute, relating to unlawful restraint of trade, which direct the attorney general to prosecute such proceedings as may be necessary to prevent violations of the act. Rev. St. 1913, secs. 4045, 4066.

The inquiry is whether the conduct of these defendants was in "restraint of trade or commerce." The employers' combination sought a riddance from union labor. To effect this design, when the strike was on, they all closed their places of business. This might amount to "restraint of trade," but I do not think so. The unions sought recognition—the privilege of collective bargaining. To accomplish this, they quit work, persuaded others not to work, and, it is claimed, resorted to violence in one or two instances. The

result was that the public had to suffer a temporary inconvenience.

Was this "restraint of trade?" I think not. What is "restraint of trade?" The lawyer, turning to 27 Cyc. 899, finds the whole definition given in these words: "All arrangements in whatever form which are designed to suppress competition are in restraint of trade both at common law and under statute." And this, too, is what the words mean to the man on the street. It is what we all have understood to be the meaning of these statutes against trusts, monopolies, and combinations in restraint of trade or commerce. Their context shows it. They affect dealers in commodities, and labor is not a commodity.

JUDGE SULLIVAN, in *Downing v. Lewis,* 56 Neb. 386, 389, in considering the question whether a laundry came under the anti-trust law, made the distinction with felicity, in these words: "The function of a laundry is to make clothes clean rather than to make clean clothes." In *Downing v. Lewis,* 59 Neb. 38, 43, speaking of contracts in "restraint of trade," this court say: "Any such contract must to some extent destroy competition." This is the meaning given to the words, "restraint of trade," so far as I know, in all state decisions. *State v. Duluth Board of Trade,* 107 Minn. 506, 23 L. R. A. n. s. 1260; 3 Bouvier's Law Dictionary, p. 2929.

But, it is insisted, did not the strike effectually prevent trade and commerce? The answer is: Yes; but only temporarily so. Laborers live on trade and commerce and suffer like the general public from all restrictions and monopolies. The difficulty with this argument lies in the fact that when unions declare a strike their first and immediate design, as their main weapon or instrument in the conflict, always is a complete stoppage of trade and commerce. To this end, they quit and persuade others not to take their places,

in the hope that their employer, unable to get men so as to resume business, will accept their terms. The opinion itself says this is permissible. Then it is not "restraint of trade." Does the fact that the striker's conduct is accompanied by violence change its character in this respect? It cannot be. The aim and the effect on trade remain the same. The effect is lessened. The constabulary rise against them. True, a conspiracy may be a lawful act by unlawful means. But here you have a conspiracy, not to interfere with trade (it already is interfered with and is permitted), but to do violence, a thing, in itself, having no relation to trade, but not permissible.

It is argued that this view is in conflict with certain federal decisions. This is doubtful. Cases involving traffic and commerce between the states are upon a different footing from the instant case, because of the limited powers of the federal government on the one hand, and the helplessness of the states on the other hand. If traffic on all roads running in and out of Chicago is stopped, Nebraska suffers. Her police powers do not extend to Illinois. She can do nothing. On the other hand, the federal authorities, too, are limited in their powers over lawbreaking in Illinois. The federal Constitution puts upon the United States the duty of preventing obstruction to the free flow of commerce, and, its powers being limited, it can well be argued that there is no adequate remedy except by injunction. The situation, too, is different. The United States has a property right in the mails which, being interfered with, may entitle it to an injunction, regardless of the Sherman anti-trust law. When cases have arisen in the federal courts, not involving railroads—traffic between the states—they have, so far as I know, given to the words "restraint of trade and commerce" the same meaning as is contended for here—an attempt

to overcome competition; to gain a monopoly; to fix prices.

As the two able trial judges said, the state's right of action, if it exists, arises under the "restraint of trade" statute. At common law the state had not this right of action, and the statute should be strictly construed. Outside the statute there would be no precedent for it except, possibly, in the language of some of the earlier federal decisions, which have not been followed in the states. What is sometimes denominated as government by injunction has not been popular. Congress in the Clayton Act practically overruled the earlier federal decisions, and later limited the federal courts in equity in the exercise of their ancient prerogative of summarily punishing, as for contempt, disobedience of its orders *in personam,* so as to permit a trial by jury. The foundation of courts of equity was the enforcement of the civil law. The state never sought injunctions of this character. If its corporations were doing *ultra vires* acts injurious to the public, this remedy might be used. So, too, in case of a public nuisance—a thing having a place, and more or less permanent in its nature. The state might, too, invoke this remedy for the protection of its property rights, the same as an individual. The rest it left to the criminal law.

The opinion, remarkably fair in stating the relations between capital and labor, almost seems to forget that neither capital nor labor is party plaintiff in the action.

It is the genius of the common law, not only that it stands for liberty, but, as a means to that end, opens the courts so that the parties themselves whose rights are invaded may go there for protection. The opinion wisely says that the courts will not attempt by injunction to regulate the differences between capital and labor; but, when we hold that the stoppage of trade amounts to restraint of trade, we come near

doing that very thing. The public inconvenience complained of must always happen. The unions are fighting, as they think, for the cause of labor. They wish to exist. They wish the privilege of collective bargaining. "If employers can and do act as a unit," they say, "then why may not we?" Of course, we will all agree with them, so long as their own methods of accomplishing these ends are not arbitrary and unfair. The common law, however, in its zeal for freedom of contract, can have no voice in this matter, but must leave both employer and employee free to work or not, to contract or not, as each may decide. The state should not be a party to the controversy. Its presence as a party may prejudice either side. If violence occurs, the state, with its courts, is here for justice. Either party injured can appeal to them for protection, and the whole constabulary of the state is armed in the name of the state to see that crime is punished according to law, and the highways of commerce kept open. Peace and quiet are desirable ends; so, too, probably, are agitation and change, with their resultant irritations and inconveniences. When the state goes into the courts in these matters, it should go prepared to do complete justice between the parties in all matters involved in the entire controversy.

Section 6, art. V of the Constitution, provides: "The supreme executive power shall be vested in the governor, who shall take care that the laws be faithfully executed." The attorney general, in commencing this action, was performing an executive function. I do not question his right to commence an action when directed to do so by legislative act. The statutes describe in detail the duties of the attorney general. Rev. St. 1913, secs. 1187, 5536, 5537, 5538. Heretofore, whenever the legislature has wished the attorney general to go into the counties to commence actions, it has so directed him. His duties, generally, are in the

supreme court. The "restraint of trade" statute makes it "the duty of the attorney general and the county attorney of each county under the direction of the attorney general" to institute these proceedings. Rev. St. 1913, sec. 4066. I do not believe that this statute intends to empower the attorney general to institute such proceedings in a local court until he has directed the county attorney to institute them.