Alice Bigpond ROACH, Plaintiff,

v.

PLAINVIEW SCHOOL DISTRICT NO. 5
et al., Defendants.

Civ. No. 77–L–117.

United States District Court,
D. Nebraska.

Dec. 4, 1978.

Clyde A. Christian, Omaha, Neb., for plaintiff.

Walter E. Zink, III, Lincoln, Neb. and Michael C. Washburn, Omaha, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

Alice Bigpond Roach, an American Indian, alleges in her second amended complaint that actions taken by the Plainview School District No. 5, the Plainview board of education, six members of that board, and the former superintendent of schools, Joel Wedergren, discriminated against her on the basis of her race, sex and national origin and that they discharged her from her employment without a hearing, in violation of her right to due process under the Fourteenth Amendment to the Constitution of the United States. The action was brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 2000e. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

In 1963, Gene Lavender, then the superintendent of the Plainview, Nebraska, schools, hired the plaintiff as his secretary. One year later, Mrs. Roach accepted an additional assignment as bookkeeper for the school district; in 1965, she assumed still another position–secretary to the Plainview board of education. No written job description ever existed. As secretary to the board of education, Mrs. Roach arranged social events, prepared the agenda for board meetings, and took minutes at the board meetings. She handled the correspondence for the board and the superintendent. The bookkeeping function related to the records of several funds, including, at different times, the activity fund, the hot lunch fund, and the general fund. Later, when a Veterans Agricultural program was instituted, a fund for it was added to Mrs. Roach's

area of responsibility. The plaintiff apparently enjoyed excellent working relationships with Lavender and his two successors, Allan K. Warner and Thomas A. Brown. The testimony of these three men characterized Mrs. Roach as a loyal employee who with some direction and supervision was highly dependable.

In July, 1973, Joel Wedergren replaced Brown as superintendent of the Plainview schools. At that point, according to the plaintiff, the situation began to deteriorate; she claims that Wedergren rarely spoke to her and never directed her to do or not to do anything. Wedergren, on the other hand, professes that he had no complaint about the plaintiff or her work until December, 1974, and that their relationship was quite normal.

The Veterans Agricultural program had been established in 1971 during Thomas Brown's tenure as superintendent. The board of education designated the superintendent as the director of the Vet Ag program and authorized him to receive $50.00 a month for his services and essentially left to him the running of the program. Delius Roach, the plaintiff's husband, because of his prior experience in teaching such a course, was chosen as instructor. The plaintiff kept the books of the Vet Ag fund and made payments from the fund. Mr. Roach was paid monthly for his services as instructor, at a rate determined by the number of students in the program, and the superintendent as director was regularly paid his salary. In March of 1973, Brown instructed Mrs. Roach to allot herself a payment for the time spent working on the books of this account. As a result, Mrs. Roach wrote a check to herself for $195.00. Later, in October, 1974, after Brown had been replaced by Wedergren, Mrs. Roach wrote to herself an additional check for $200.00. No authorization was ever made by the board of education for any payment to Mrs. Roach, and the payment of $200.00 was made without any authorization from Wedergren.

The plaintiff had grown suspicious of what she described as Wedergren's "silent treatment" towards her. When he asked her in early December, 1974, to deliver to him the Vet Ag books, which consisted of checks, check stubs, and bank statements, Mrs. Roach instead sent them to Charles Haase, an accountant who had audited certain of the school district's funds in the past. She prepared a letter which Leslie Weber, president of the board, signed, authorizing the auditor to have the books. She delivered to Wedergren only a statement of the status of the Vet Ag funds.

The request for the books had been made by Wedergren at the direction of a committee of the board of education. The possible need for purchasing new equipment for the vocational agriculture course prompted the committee to ask the superintendent to bring the Vet Ag books. When Mrs. Roach did not bring them, saying they were at the auditor's, the committee obtained them from the auditor on the morning of December 16. The committee examined them that day and learned from the examination that some of the checks bore different dates than the stubs which matched the checks, that some checks payable to Mrs. Roach's husband had been deposited before the date on either the particular check or its stub, that checks written to Mrs. Roach's husband during the course of the months had progressively been dated at an earlier time in the month, and that two checks totaling $395.00 had been issued to Mrs. Roach without authorization by the board of education. Those facts and Mrs. Roach's failure to turn over the Vet Ag books were discussed at the board's meeting on the evening of December 16, 1974, evidently in executive session. Mrs. Roach did attend the executive session and was permitted to give her version of the facts without Wedergren's being present. Wedergren, in the plaintiff's absence, related in executive session his recollection of the evidence. Both were present when the board members discussed the matter further in executive session. The board that evening voted to relieve Mrs. Roach of her duties as secretary for the board "until the board re-organized in January, 1975, and to retain her only as a bookkeeper for that period of time." Defendants' Exhibit

7 H. Two new members of the board were to take office in early January, 1975, and the board at that time would be reorganized.

On January 28, 1975, Dorothy Hanneman, the newly elected president of the board of education, telephoned Mrs. Roach and asked. her to attend a special session of the board that evening. Mrs. Hanneman had previously prepared and posted notices of the meeting. At the meeting the agenda was read as follows:

"1. The Vet Ag Program review 2. Elect a District Secretary 3. Appoint a bookkeeper for the district."

Defendants' Exhibit 7 I

Mrs. Hanneman then called for discussion of the items on the agenda and discussion was had. The minutes of the meeting reflect that:

"Mrs. Roach congratulated Dorothy [Hanneman] on the new Presidents position and spoke on her own behalf as bookkeeper.

\*   \*   \*   \*   \*   \*

"Mrs. Roach spoke about the Vet Ag program explaining the $395 bookkeeping fee was approved by Mr. Brown. Warren Lingenfelter stated that Mr. Brown had no authority to do so."

Defendants' Exhibit 7 I

The Vet Ag program was discussed in detail by other persons, and then, as reflected in the minutes:

"Hanneman read a statement concerning reasons why a new secretary and bookkeeper were to be elected and appointed. Statement was as follows: 'Because of gross disobedience associated with a request for the Vet Ag books by committee members of the board of education and the Supt. of schools in which they were deliberately denied access to the same, by the secretary–bookkeeper of the Plainview Public Schools and because the same records indicate irregularities such as: (A) Differing entries on check stubs as compared to the actual checks. (B) Inappropriate salary payments made with monies intended for the general fund. (C)

Lack of annual audit of the Vet Ag program for the school years 1972–73 and 1973–74. _____ Now then, the problem created involves: (1) The matter of board liability for all direct or indirectly related school funds and the potential for a citizen suit against the district. "2. The creditability of the current school auditor and the question that now involves the entire set of school district books. 3. The necessity of re–vamping the Vet Ag program so that salaries are in line with state regulations and surrounding school practices. 4. So that Vet Ag tuition rates may be reduced to be in line, again, with state regulations and surrounding school practices."

Discussion was had by the board, but no recognition by the chair of any other person was made, although some tried to gain recognition for the purpose of responding to the statement of reasons, which obviously referred to Mrs. Roach. The meeting of the board was a public meeting and was attended by a substantial number of members of the community. The board then elected Leota Elwood as secretary and declared that the bookkeeping functions would be directly the responsibility of Wedergren until an auditor's recommendation for the hiring of a bookkeeper be received, thereby terminating the employment of Mrs. Roach.

The evidence at the trial, including the audit of the Vet Ag program (defendants' Exhibit J), shows that all funds were accounted for in the bookkeeping records, that bookkeeping fees were paid to Mrs. Roach in the amount of $195.00 on March 27, 1973, upon the authorization of Superintendent Brown but without authorization of the board of education, and in the amount of $200.00 on October 3, 1974, without authorization of Superintendent Wedergren or the authorization of the board of education, that dates on several checks differed from dates on the corresponding check stubs (the only explanation offered by Mrs. Roach was that, because no one else was writing checks and the auditor previously had said that the Vet Ag books did not need to be audited, she supposed that consistency in dates was unimportant), that a number of

checks written to Mr. Roach for his salary were endorsed by Mrs. Roach and deposited by her prior to the date on the checks or the check stubs (the only explanation offered by Mrs. Roach was that no one had ever instructed her as to the date the monthly payment was to be made to her husband), and that progressively over the months the checks to her husband for his salary were dated earlier in the month (the only explanation offered by Mrs. Roach was that no one had instructed her as to the date for making the monthly payments to Mr. Roach). The evidence further establishes that Mrs. Roach did disobey Mr. Wedergren's request that she bring to him the Vet Ag books. Those books were in her possession at the time the request was made, but she delivered them, instead, to the auditor. There is no indication that Mr. Roach was not entitled to the money he received, and there is no evidence of any "inappropriate salary payments," other than those for bookkeeping fees totaling $395.00. Mr. Haase, the auditor, had, as Mrs. Roach asserts, said that the Vet Ag books need not be audited and that is the reason they were not audited for the school years 1972–1973 and 1973–1974.

### I.

The plaintiff's claim that she was deprived of her employment because of her race, sex or national origin is not supported by the evidence. She was relieved of her duties for the reasons stated in the minutes of the meeting of the board of education on January 28, 1975, and no others.

### II.

Because the Constitution of the United States in the Fourteenth Amendment protects persons from deprival of property by a state without due process of law, the plaintiff was entitled to due process if she had a property interest in her employment. In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the court said:

"... To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it.

. . . . .

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits...." 408 U.S. at 577, 92 S.Ct. at 2709.

In *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976), the court said:

"A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law...."

The plaintiff here had an unwritten contract, the terms of which were negotiated each year with the board of education. Her salary was paid monthly, but computed on an annual rate. She cites no authority for the proposition that any of these factors alone or in combination result under Nebraska law in the formation of an employment contract for a fixed term. I am satisfied that the contract under Nebraska law was for an indefinite term, whereby "the employer may discharge, or the employee stop work, at his own pleasure." *Stewart v. North Side Produce Company,* 197 Neb. 245, 246, 248 N.W.2d 37 (1976); *State v. Employers of Labor,* 102 Neb. 768, 169 N.W. 717 (1918); *Ploog v. Roberts Dairy Co.,* 122 Neb. 540, 240 N.W. 764 (1932). Without some reasonable expectation of continued employment, Mrs. Roach cannot be said to have any property interest in her job; consequently, the constitutional protections of the Fourteenth Amendment do not attach.

### III.

A deprivation of a liberty interest without due process of law is an additional

ground relied upon by the plaintiff for relief.

The Fourteenth Amendment prohibits a state's taking liberty from a person without due process, and liberty is broadly defined. It includes, at least, freedom from bodily restraint, freedom "to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Board of Regents of State Colleges v. Roth*, supra.

Mere discharge from employment does not deprive a person of a liberty interest, unless there is some special feature which accompanies the discharge that touches a liberty interest. The clearest explication of that process is in *Roth*, supra, wherein the court said:

"The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' . . . In such a case, due process would accord an opportunity to refute the charge before University officials. . . .

"Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. . . . Had it done so, this, again, would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . .' . . ." 408 U.S. at 573–574, 92 S.Ct. at 2707.

Was any charge made against the plaintiff by the defendants such that it "might seriously damage [her] standing and associations in the community," or did any charge impose on her "a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities"?

That is a close question. There is no evidence that Mrs. Roach was denied any employment opportunity. She was offered the first job she sought, although did not accept it, and she accepted a position in August, 1975, for more salary than she received from the board of education at Plainview when she was terminated. There is evidence that persons in Plainview after her termination were heard talking about whether she had taken any money from the school's funds, but no evidence that anybody believed that she had taken any money and no evidence that her reputation or standing in the community or in the business or professional world was any less after the termination than before.

*Roth* sets two lines of thought: (1) a charge that might seriously damage one's standing and associations in the community; and (2) a charge that imposes a stigma or other disability that would foreclose freedom to take advantage of other employment opportunities. The examples under (1) given by the court in *Roth* were charges of dishonesty and immorality, such as alcoholism (*Wisconsin v. Constanineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)); disloyalty (*Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952)); communism (*Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951)); and subversive activities (*United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946)). Racism is a similar charge. *Wellner v. Minnesota State Junior College Board*, 487 F.2d 153 (C.A. 8th Cir. 1973). The examples under (2) were imposition of a statute limiting the number of aliens an employer could hire (*Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915)) and use of qualification standards for admission to the bar (*Schware v. Board of Bar Examiners of New Mexico*,

353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)). Similar is *Greenhill v. Bailey*, 519 F.2d 5 (C.A. 8th Cir. 1975), wherein the derogatory material was not only placed in a medical student's file but sent to the Liaison Committee on Medical Education of the Association of American Medical Colleges, where it would be available to any school to which the student's record might be sent. The nature of the "stigma" or "disability" encompassed in (2) appears to be a condition arising from a law, rule, or practice applicable or common to a substantial segment of the occupational group to which the affected person belongs or seeks to belong. Nothing like that appears in the present case.

As to concept (1), the question is whether the charges connote dishonesty or immorality, akin to a charge of alcoholism, disloyalty, subversive activities, or racism. I conclude that they do.

The charges were:

1. "gross disobedience associated with a request for the Vet Ag books by committee members of the board of education and the Supt. of schools in which they were deliberately denied access to the same, by the secretary–bookkeeper of the Plainview Public Schools"

2. "the same records [of the Vet Ag program] indicate irregularities such as: (A) Differing entries on check stubs as compared to the actual checks. (B) Inappropriate salary payments made with monies intended for the general fund. (C) Lack of annual audit of the Vet Ag program for the school years 1972–73 and 1973–74."

The disobedience charge alone poses no claim of dishonesty or immorality. The audit complaint had no merit, because it was not and could not reasonably be said to have been Mrs. Roach's duty to have an audit made. Standing alone, it has no implication of dishonesty or immorality.

"[I]rregularities such as ... [d]iffering entries on check stubs as compared to the actual checks" and "[i]nappropriate salary payments made with monies intended for the general fund" project a hint of dishonesty. It is true that a set or several sets of facts could be imagined that would fall within the precise words of the charges without amounting to dishonesty, but one or more sets of facts could also easily be thought of that would fit the words and constitute dishonesty. Indeed, the ambiguity of the words dims slightly and the words tilt toward an implication of dishonesty when the statement in the minutes immediately following the charges is read:

> "Now then, the problem created involves: (1) The matter of board liability for all direct or indirectly related school funds and the potential for a citizen suit against the district...."

The tone is one of concern over money loss, and money loss and dishonesty are natural companions. A declaration of "irregularities," "differing entries on check stubs as compared to the actual checks," "inappropriate salary payments," "monies intended for the general fund," "deliberately denied access" to the books, "board liability for all ... school funds," and "the potential for a citizen suit," when aimed at the person who keeps the books for those funds, leaves a strong innuendo of mishandling beyond mere carelessness or ineptitude. Dishonesty is at least an impression that an audience, like the one at the January 28 meeting of the board of education, could reasonably sense from the declaration as a whole.

It is true, as argued by the defendants, that "the hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely 'to provide the person an opportunity to clear his name.'" *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977). Unless the employee can reasonably challenge the substantial truth of the charges a hearing would provide no useful purpose. The defendants argue that Mrs. Roach admits in her testimony that the charges read against her are true, so *Codd v. Velger* compels a judgment for the defendants. I do not agree.

The testimony of Mrs. Roach admits no loss of funds and no dishonesty, although it does admit a set of facts within the wording of the charges. Mrs. Roach deserved a chance to clear her name in the sense of disabusing the board, listeners, and readers of the minutes of the implications of dishonesty arising from loss of money or, at least, of putting things in a balanced perspective.

Mrs. Roach was not afforded the opportunity. At the board meeting she spoke *before* the charges against her were read. She evidently knew of some, perhaps all, the charges from her attending the executive session of the board of education on December 16, but she could not have known of the wording until the January 28 meeting, because the wording was not devised until shortly before that, and there is no indication that she expected there to be a public implication of dishonesty. She explained that the $395.00 "bookkeeping fee" (evidently the total of two payments to herself) was approved by Mr. Brown, the superintendent at the time $195.00 of that payment was paid to her, but there is no evidence that she spoke to any other features of what were moments later to be the statement of reasons for her termination. Then the entire statement of reasons was read, but the president of the board gave Mrs. Roach no opportunity to respond after the reading. Therein lies the lack of due process. When a public charge connoting dishonesty is made, a public response is deserved.

### REMEDY

The plaintiff has specifically withdrawn her claim for damages, and she would be entitled to none anyway, because there has been no showing of any bad faith on the part of any defendant, or, more precisely, that any of the defendants knew or should have known that failure to give Mrs. Roach reasonable opportunity to refute the implications of the charges after receiving notice of what the charges were would amount to a denial of a constitutional right. See *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Furthermore,

no loss has been shown that would warrant assessment of more than nominal damages in any event.

Reinstatement, back pay from January 28 to August 19, 1975, less unemployment compensation received, plus attorney fees are the relief sought. It occurs to me that neither reinstatement nor back pay is appropriate. The plaintiff's job is not the constitutionally protected interest which the plaintiff lost; she had no property interest in the job. The constitutionally protected liberty interest lost was not the liberty to perform that job but the liberty to be free from accusations of dishonesty without an opportunity to answer. It is that interest which should be made whole. In the setting of this case, that perhaps could be done without reinstatement or back pay, by the court's ordering a public hearing before the school board at which Mrs. Roach would have full opportunity to present her case to clear her name.

Whether this is analytically required by *Codd v. Velger*, supra, is an interesting issue. The majority there said:

" . . . [T]he contemplated hearing does not embrace any determination analogous to the 'second step' of the parole revocation proceeding, which would in effect be a determination of whether or not, conceding that the report were true, the employee was properly refused re-employment. Since the District Court found that respondent had no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for failing to rehire him presents no federal constitutional question. Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required. . . ." 429 U.S. at 628, 97 S.Ct. at 884.

Here, the plaintiff has not admitted dishonesty, but has admitted ample improprieties to justify discharge even if she had a property interest in her employment. But the charges against her were pregnant with "a false and defamatory impression" be-

yond what she has admitted. Perhaps, then, "such a hearing"—one determining the validity of the discharge—is required. In this case, however, the issue may be largely academic.

If Mrs. Roach is entitled to reinstatement, her back pay amounts to zero, because she has received more income since her discharge from other sources than she would have received from her job with the Plainview school. Her rate of pay at the time of her termination was $7,000.00 a year, or $583.33 a month. Between January 28, 1975, and August 19, 1975, she received $1,944.00 in unemployment compensation, which she concedes must be deducted from any back pay award. She has also received a salary at the rate of at least $8,000.00 a year, or $666.66 a month, since August 19, 1975, to date. If she had been paid by the Plainview board of education $583.33[1] a month from January 28, 1975, until today, she would have been paid $26,733.18. Figuring only on the basis of an $8,000.00 salary rate at her new employment, she has actually been paid since January 28, 1975, $30,666.00, plus unemployment compensation of $1,944.00. It is proper that the entire amount earned since her discharge be deducted, of course, in order to learn what she has lost as a result of the discharge. *Gieringer v. Center School District No. 58*, 477 F.2d 1164 (C.A. 8th Cir. 1973); *Cooley v. Board of Education of Forrest City School District*, 453 F.2d 282 (C.A. 8th Cir. 1972).

Mrs. Roach is now employed and simply to reinstate her to another job would be inequitable. She should not be expected to perform duties she is in no position to perform because of full–time employment elsewhere and the board should not be required to pay her until she is ready to do its work. To help assure compliance with the judgment as to a hearing, I shall order reinstatement, subject to the condition noted below, approximating a time when she will be ready, willing and able to assume the duties of a position with the Plainview school district comparable to the one held by her on January 28, 1975.

It is noted that Mrs. Roach has not asked in oral argument or by brief for an opportunity for a hearing before the board of education, but the prayer of her second amended complaint is broad enough to include it. It is conceivable that she does not want such a hearing, in light of her trial here, but I shall order one if she signifies a desire for one.

The plaintiff's counsel is entitled to a fee from the defendants. The award will be against the superintendent, Joel Wedergren, as well as the board of education and its member defendants, because of the direct involvement of each in the framing or announcement of the grounds for the plaintiff's termination. The plaintiff's counsel may make a showing regarding his fee anytime on or before December 15, 1978. The defendants shall have until December 22, 1978, for making of a countershowing.

It seems sensible not to enter a judgment until the determination is made regarding the amount of fee to be awarded to the plaintiff's counsel. Accordingly, entry of judgment will be withheld at this time. For counsel's benefit and for such response as they wish to make, however, there is attached to this memorandum the form of a probable judgment.

---

1. There is no evidence before me regarding any increases in salary rate for comparable positions with the Plainview board of education, although no doubt there were some. On the other hand, Mrs. Roach's salary rate in her job with the University of Nebraska since August 19, 1975, has been raised from about $8,000.00 to $9,400.00, but when the increase or increases came is not in evidence.