Theodore G. HUNT, Respondent,

v.

IBM MID AMERICA EMPLOYEES FEDERAL CREDIT UNION, Respondent,

Board of Directors of IBM Mid America Employees Federal Credit Union, Petitioner, Appellant.

No. C3–84–1359.

Supreme Court of Minnesota.

April 4, 1986.

Daniel J. Heuel, Rochester, for appellant.

Robert Patterson, Rochester, for Mid America Employees Federal Credit Union.

Nancy Brostrom Vollertsen, Rochester, for Theodore Hunt.

KELLEY, Justice.

Respondent Theodore Hunt claims appellant IBM Mid America Employees Federal Credit Union (Mid America) breached his employment contract by wrongfully discharging him. Holding that the respondent was an employee-at-will, the trial court granted the employer's summary judgment motion. The court of appeals reversed and remanded the case to the trial court for a factual determination whether an employee handbook modified the employee's at-will status, and whether the request for respondent's resignation violated his employment "contract." [1] We granted Mid America's petition for further review. We reverse.

Respondent Hunt was hired by Mid America to be its assistant general manager in May 1981. At the time of hiring, Mid America furnished Hunt a copy of an employee's handbook, a letter confirming his appointment, and a job description. Hunt

1. *Hunt v. IBM Mid Am. Employees Fed. Credit*    *Union,* 358 N.W.2d 461 (Minn.App.1984).

makes no claim of any formal written contract, nor does he allege any oral or written promises from his employer respecting the duration of the employment. He claims, however, that the handbook constituted an offer for a unilateral contract proscribing the appellant's right to terminate respondent, and that, therefore, appellant breached the unilateral contract as well as an implied covenant of good faith and fair dealing.

In 1983, Hunt was named general manager at the credit union. Again, the parties did not execute a formal written or oral employment contract. As general manager, Hunt was the credit union's chief operational officer. He reported directly to the president of the board of directors. His responsibilities included supervising approximately 115 full-time employees in 13 offices in six midwestern states.

In his deposition, Hunt conceded he had no recollection of any discussions with his employer about the circumstances under which he would be terminated from employment. He assumed his employment would be lengthy and that he would retire from the position. He based this assumption upon his promotion to general manager and the seeming satisfaction of the board of directors with his performance. In evaluations of job performance, he was told that he was "cold and aloof" but also "progressing quite well." He admitted that although he considered his job a long-term commitment, he, himself, felt free to leave the credit union for any reason.[2]

Hunt's termination had its genesis in a relationship he developed with a female employee-teller. He first became acquainted with her at a social party outside the office in January 1983. At the time, Hunt was 48 years old, had been separated from his wife for two years, and was in the midst of a marriage dissolution action. The female teller was 25 and married.[3] A social relationship grew between the two outside the office. They had sexual relations. On one occasion in early May, the teller joined Hunt on a week-long business trip to California. Hunt did not deem the relationship detrimental either to the business or his ability to function as general manager. Other employees, however, felt the affair created awkward working conditions for them. Rumors of the affair spread through the credit union that spring. Hunt met with individual managers to discuss the rumors. Towards the end of May 1983, the credit union's personnel manager asked the teller to resign. The reason given was unsatisfactory work performance.[4]

Hunt, considering the resignation demand unjustified, attempted without success to have the teller reinstated. On June 1, the credit union president asked for Hunt's resignation. Hunt complied by resigning on the same day. Hunt attributed his requested resignation to his relationship with the teller rather than his job performance. He claims the president told him, "as far as managing the credit union and carrying out my responsibilities, it was impeccable."

In this action, Hunt claims his resignation was a constructive, discharge in violation of terms of an implied contract created by the employee handbook. He likewise asserts breach of implied covenants of good faith and fair dealing.

---

2. The trial court granted the credit union's motion for summary judgment. As is not unusual in such case, the factual record is far from being complete. It consists only of Hunt's deposition and responses to demands for production of documents. The documents consist mainly of written recollections of office conversations between Hunt and various staff members. No affidavits, interrogatories or admissions were filed in conjunction with the summary judgment motion.

3. Hunt's marriage dissolution was "finalized" in May 1983. The teller's marriage was dissolved by court action some time later.

4. At the time she was offered an alternative of probation, but chose instead to resign. She likewise sued the credit union. In her case, the trial court also granted the employer summary judgment. The court of appeals affirmed that ruling. *Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 358 N.W.2d 461 (Minn.App.1984). She has not sought to petition for further review.

In support of his case, Hunt cites the following three sections from the Employee Reference Manual for the IBM Mid America Employees Federal Credit Union:

YOU ARE THE KEY TO OUR SUCCESS:

. . . .

You can be assured that you will have every opportunity to develop your skills and learning power to the fullest extent with our Credit Union. In terms of hiring and promotion, our aim is to attract the best people and to encourage their peak development by promoting within according to performance.

. . . .

DISCIPLINARY ACTION

If an employee of the Credit Union is reprimanded or asked to make certain corrections in theif (sic) job performance they will be placed on probation and it will be documented and placed in their personnel file. Improvement must be shown or the employee may be terminated.

. . . .

DISCHARGE

In the event of a serious offense, an employee will be terminated immediately.

The handbook does not define or give specific examples of a "serious offense" nor does it give procedures for terminating an employee.

The trial court determined the general policy statements in the manual were too indefinite to constitute a legal offer for a unilateral contract. It likewise could find no outward manifestations of the parties to support the existence of any agreement not to terminate employees except for a serious offense. Finally, since it found Hunt had resigned voluntarily and had not been constructively discharged, it found he had no legal claim for breach of contract or breach of any covenant of good faith and fair dealing.

In reversing the trial court, the court of appeals ruled that the language in the company manual was sufficiently definite to raise a genuine issue of material fact for resolution by the fact finder. Thus, it remanded the case for a trial determination whether the employee manual modified Hunt's at-will employment and whether the requested resignation violated Hunt's employment contract.[5]

A district court may grant summary judgment if the pleadings and other documents before the court "show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn.R.Civ.P. 56.03 (1984). On appeal from summary judgment, it is the function of the appellate court to determine whether genuine issues of material fact exist and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). The rule in Minnesota is summary judgment is proper when the nonmoving party fails to provide the court with specific facts indicating that there is a genuine issue of fact. *Erickson v. General United Life Ins. Co.*, 256 N.W.2d 255, 258–59 (Minn.1977). In order to successfully oppose a motion for summary judgment, a party cannot rely upon mere general statements of fact but rather must demonstrate at the time the motion is made that specific facts are in existence which create a genuine issue for trial. *Id.* (citing *Borom v. City of St. Paul*, 289 Minn. 371, 184 N.W.2d 595 (1971); Minn.R. Civ.P. 56.05).[6]

The parties here do not dispute the material fact that Hunt was an at-will employee. The parties also do not dispute there was no oral or written contract on the duration of Hunt's employment. The complaint,

---

**5.** The court of appeals did not address the issue of an implied covenant of good faith and fair dealing.

**6.** Minn.R.Civ.P. 56.05 provides in relevant part: When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere averments or denials of his pleading but must present specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

filed in district court by Hunt, lists the employee reference manual as the *sole* basis for creating an implied contract of employment. In his brief opposing the summary judgment motion, Hunt refers only to statements made during his deposition about his general subjective impressions and assumptions about the job, not to any specific promises made by his employer.

Hunt offered no affidavit or any other document other than the employee manual to support his contractual claim. The record before the trial court was devoid of any evidence or even allegation that any officer with Mid America specifically promised him a lifetime job with dismissal for cause only. In sum, Hunt presented no facts showing there was a genuine issue for trial. The only question, then, is whether language in the manual was sufficiently definite to raise a triable issue of fact.

■ Inasmuch as Hunt is relying exclusively on the language contained in the employee manual in his attempt to establish the existence of a contract containing disciplinary and termination procedures, the resolution of whether the language used rises to the level of a contract is for the court. Where, as here, the intent of the parties is totally ascertainable from the writing, construction is for the court. *See Donnay v. Boulware,* 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). The general rule is that "the construction of a writing which is unambiguous is for the court, particularly when the intention of the parties is to be gained wholly from the writing." *Rooney v. Dayton-Hudson Corp.,* 310 Minn. 256, 262 n. 2, 246 N.W.2d 170, 173 n. 2 (1976) (quoting *Leslie v. Minneapolis Teachers Retirement Fund Ass'n,* 218 Minn. 369, 373, 16 N.W.2d 313, 315 (1944)). Where the issue to be determined is the nature

and effect of a writing, the contents of which is not disputed, the general rule is particularly applicable. *Id.*

■ In determining whether summary judgment was appropriately granted, we now examine the employee handbook initially given to Hunt when he was first employed. Did the handbook contain sufficiently definite terms, which, when accepted by Hunt by going to work, created a binding unilateral employment contract? Unless it does, the parties concede Hunt was an at-will employee; he was hired for an indefinite term and could be terminated at once. *See Skagerberg v. Blandin Paper Co.,* 197 Minn. 291, 294, 266 N.W. 872, 873–74 (1936). Likewise, he could be summarily dismissed. *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962).

In *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983), we recognized an exception to the long standing terminable at-will rule when we held that an employee hired for an indefinite term might maintain an action for breach of contract if termination provisions in an employee handbook were sufficiently definite to meet the requirements for the formation of a unilateral contract.[7]

As did the plaintiff employee in *Pine River,* Hunt relies on an employee manual to establish alleged contract rights. As established earlier, he does not allege oral promises relative to the duration of his position, and concedes that at all times he felt free to leave his job.

Examination of the language of the employee manual in this case compared to that in *Pine River* reveals major differences. For example, the disciplinary and discharge section in *Pine River* "set out in

---

7. We have recognized two other exceptions to the at-will common law rule. First, independent consideration beyond personal employment services can create a contract limiting discharge to good cause. *See Bussard v. College of St. Thomas, Inc.,* 294 Minn. 215, 200 N.W.2d 155 (1972) (plaintiff had conveyed ownership interest in magazine to defendant and had been assured he could remain editor for an indefinite term). Second, promissory estoppel principles

can be used to imply an employment contract. *See Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114 (Minn.1981) (defendant revoked job offer after plaintiff had resigned from one job and rejected another job offer). Hunt did not raise a contractual cause of action under either of these theories. He further does not challenge his discharge on public policy grounds, nor does he claim the discharge was retaliatory or abusive.

definite language an offer of a unilateral contract for procedures to be followed in job termination." 333 N.W.2d at 630. In *Pine River* the manual explicitly promises discharge only for an employee "whose conduct does not improve as a result of the previous action taken." *Id.* at 626 n. 3.

When this definite and specific language is contrasted with the vague language on disciplinary action and discharge in the employee reference manual issued to Hunt by Mid America, the distinction between the two is readily apparent. Mid America's manual fails to provide any detailed or definite disciplinary procedure. The *Pine River* manual provided a definite, detailed four-step procedure. Moreover, Mid America's manual omits any definite option of a probationary period for an employee before final termination. Here there is no definite language to constitute an offer of a unilateral contract on job termination procedures. *See Pine River*, 333 N.W.2d at 630. Finally, the Mid America manual warns of the possibility of summary discharge: "In the event of a serious offense, an employee will be terminated immediately."[8]

Significantly, the manual neither defines nor gives examples of what is a "serious offense." This vagueness falls far short of the specificity necessary for a contractual offer under principles enunciated in *Pine River*. If this case were to go to trial, a jury would literally be asked to draft new contractual terms and define "serious offense." The jury, then, rather than the employer, would decide what offenses are serious enough to merit discharge and whether Hunt's affair was such an offense.

Hunt's subjective impressions and assumptions are not relevant for purposes of ascertaining contractual terms. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions. *Pine River*, 333 N.W.2d at 626. Furthermore, Hunt makes no claim that past practices of Mid America or statements of his superiors cast

any different or more definite meaning than the plain and usual meaning of the words appearing in the manual. There exists no contention that Mid America had ever subjectively considered, or, more importantly, manifested objectively that the words "serious offense" could be equated with "good cause." Moreover, there is no showing that Hunt's conduct in his relationship with the teller, and the resulting awkward working conditions of other company employees, was anything but a "serious offense" meriting discharge.

Finally, not explaining "serious offense" arguably left Mid America discretion to determine what constitutes a serious offense. To decide whether a contract has been breached, a fact-finder needs reasonably definite terms to interpret and apply— terms which are lacking in this case. None of the employee manual provisions relied on by Hunt are definite enough to be an offer for a unilateral contract.

For these reasons, we hold as a matter of law that Mid America's discipline and termination phraseology in the employment manual was too indefinite to form the basis of an enforceable contract giving rise to a contract action for its breach. The trial court, accordingly, properly granted summary judgment on the implied contract claim.

■ Hunt also claims he was wrongfully discharged because Mid America had breached an implied covenant of good faith and fair dealing. The court of appeals, because it disposed of the appeal by reversing the trial court's finding of no contract, did not address the issue. Hunt, therefore, claims the issue of implied covenant and fair dealing are not properly before this court for review. However, in Minnesota, appellate courts may review any order involving the merits or affecting the judgment. Minn.R.Civ.App.P. 103.04.

The trial court, without specifically addressing the issue of whether there was an implied covenant of good faith and fair

---

8. The language on job security in both manuals is similarly vague. We held in *Pine River* that the language constituted nothing "more than a general statement of policy." 333 N.W.2d at 630.

dealing, ruled that even if such a covenant existed, there was no breach because Hunt voluntarily resigned from his position. In so ruling, the trial court rejected Hunt's contention that his resignation was, in reality, a "constructive discharge." If an implied covenant of good faith and fair dealing existed, the trial court erred in granting summary judgment on this issue because the facts surrounding Hunt's resignation were in dispute to the extent that the trier of fact could have found a "constructive discharge." Therefore, the trial court's order granting Mid America summary judgment can only be sustained if, as a matter of law, there existed no covenant of good faith and fair dealing.

Our examination of the facts and circumstances surrounding Mid America's hiring and its employment of Hunt, including the issuance of the employee manual, work evaluation, and statements of supervisors, as a matter of law exhibits the absence of any implied covenant to discharge only for cause. Since at least 1936, this court has recognized that "permanent employment," whether expressed in manuals or otherwise, does not change an at-will contract into one of "discharge-for-cause-only" or create an implied covenant of discharge only in good faith. *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 294–95, 266 N.W. 872, 874 (1936). *See also Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 533, 117 N.W.2d 213, 221 (1962).

The statements in Mid America's employee handbook constitute nothing more than general statements of policy which fall far short of meeting contractual requirements of an enforceable covenant. *See Degen v. Investors Diversified Services, Inc.*, 260 Minn. 424, 110 N.W.2d 863 (1961). In *Pine River*, the job security provisions of the bank's employee handbook set forth, if anything, more definite language from which an implication of permanent employment could be deduced, yet we held there that the general policy statements could not rise

to the level of an implied promise of permanent employment. 333 N.W.2d at 630.[9]

Moreover, we have not read an implied covenant of good faith and fair dealing into employment contracts. *See Wild v. Rarig*, 302 Minn. 419, 441, 234 N.W.2d 775, 790 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). In that same case, we rejected bad faith termination of a contract as an independent tort as the basis for punitive damages. *Id.* 302 Minn. at 442, 234 N.W.2d at 790. *See also Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443, 452 (Minn.1980); *Furlev Sales and Assoc., Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 26 (Minn. 1982). For sound policy reasons, a majority of our sister jurisdictions have likewise rejected the implication of a covenant of good faith termination. As the Supreme Court of Hawaii has stated:

[T]o imply into each employment contract a duty to terminate in good faith would seem to subject each discharge to judicial incursions into the amorphous concept of bad faith. We are not persuaded that protection of employees requires such an intrusion on the employment relationship or such an imposition on the courts.

*Parnar v. Americana Hotels, Inc.*, 65 Hawaii 370, 652 P.2d 625, 629 (1982). Likewise, in rejecting the implied covenant of good faith and fair dealing, the Washington Supreme Court stated: "We do not adopt this exception. An employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and this exception does not strike the proper balance." *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1086 (1984). Similarly, the Wisconsin Supreme Court has stated:

We refuse to impose a duty to terminate in good faith into employment contracts. * * * [W]e feel it unnecessary and unwarranted for the courts to be-

---

**9.** In a case where good job performance and long-term service were both present, unlike the case where Hunt's job performance was acceptable but lacked the element of longevity, the Minnesota Court of Appeals noted: "If this con-

tract has an implied term of good cause before termination, then all at-will contracts contain an implied limitation of good cause." *Bakker v. Metropolitan Pediatric*, 355 N.W.2d 330, 331 (Minn.App.1984).

come arbiters of any termination that may have a tinge of bad faith attached. Imposing a good faith duty to terminate would unduly restrict an employer's discretion in managing the work force.

*Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 569, 335 N.W.2d 834, 838 (1983). The New York court has noted a change such as this in employment laws is best left to the legislature. *See Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 304–05, 448 N.E.2d 86, 89–90, 461 N.Y.S.2d 232, 235–36 (1983). *See generally* Marrinan *Employment At-Will: Pandora's Box May Have an Attractive Cover,* 7 Hamline L.Rev. 155 (1984), wherein the author argues for legislation to bring clear standards, uniformity, predictability, and stability to employer-employee relationships.

Finally, it is for the court to determine as a matter of law whether these types of general policy statements found in Mid America's employment manual rise to the level of meeting contractual requirements for an offer. *See Cederstrand,* 263 Minn. at 532, 117 N.W.2d at 221 and *Degen,* 260 Minn. at 428, 110 N.W.2d at 866. Here, they do not.

Accordingly, we reverse the court of appeals and remand to the trial court for entry of judgment.