GATES RUBBER COMPANY,
Appellant,

v.

Paul PORWOLL, Respondent.

No. C3–86–717.

Court of Appeals of Minnesota.

Oct. 28, 1986.

Thomas M. Sipkins, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, for appellant.

Stewart R. Perry, Wayzata, for respondent.

Heard, considered, and decided by LESLIE, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

WOZNIAK, Judge.

Paul Porwoll claims he was wrongfully discharged from his position as a salesman for the Gates Rubber Company. Following a bench trial, the district court, Hennepin County, found for the plaintiff and awarded damages in the amount of $126,877.75, plus costs. Gates appeals from the denial of its motion for amended findings and a new trial and from the judgment. We reverse and remand.

## FACTS

Gates Rubber Company is based in Denver. It manufactures and sells rubber products, such as garden hoses and automotive belts. Porwoll was hired by Gates in 1968. He testified that he did not enter into a written employment contract, and that he was not promised employment for a definite term.

In 1975, Porwoll was injured in an automobile accident in the course of his employment with Gates. In 1980, he was still suffering back pain from the accident. Following the accident, Porwoll also developed a progressively worsening diabetic condition. In 1983, after he was terminated by Gates, the Social Security Administration determined that Porwoll was disabled within the meaning of the Social Security Act due to his diabetic condition and severe arthritis of the spine.

During 1979 and 1980, Porwoll was employed by Gates as its northern marketing

manager. A "position description" issued in February 1980 states that Porwoll's function was "[b]y direct and indirect contact with key customers and prospects," to "maintain[ ] and expand[ ] our market share at acceptable profit levels." He was to:

> [c]ontact customers and prospects to keep them up to date on our products, programs, policies and pricing so that we not only maintain our current market share but also show continual growth * * *.

The job description also provided that "[t]ravel will be over 50% as a general rule."

In early 1980, Porwoll was assigned to work on merchandise changeovers at the Pep Boys automotive parts chain on the east and west coasts. Gates had taken over this account from its competitor and had promised they would change over all the inventory in a short period of time. To do this, they put their sales force to work. It was strenuous physical labor. Porwoll spent two weeks on the West coast and two weeks on the east coast working on the Pep Boys changeover. He testified that, during this period, it was difficult for him to schedule anything locally because the company kept postponing the changeover. After he returned from the changeover, Porwoll testified that he was exhausted.

On April 22, 1980, Jack Williams, vice president of Gates, and Richard Henderson, hardware sales manager, came out to Minneapolis, which they usually did every year. They wanted to meet with Porwoll's six or seven biggest accounts, including Our Own Hardware.

On April 24, the third and last day of the trip, Porwoll, Henderson, and Williams went to the general offices of Our Own Hardware. When they arrived at the general office, the receptionist said something to the effect of "You have not been here for awhile * * * we moved the buying offices in November."

She then produced a map which indicated that, effective Monday, November 19, 1979, all Our Own Hardware buying personnel had been moved to a new location six or eight blocks from the home office. According to Williams, this was a great shock to Porwoll, and Williams and Henderson were "absolutely dumbfounded." Porwoll admitted at trial that he had not been to the Our Own offices since October or November of 1979.

As Porwoll, Williams, and Henderson drove to the new buying offices, Williams asked Porwoll "What in the f____ have you been doing?" and told Porwoll he would have to talk long and hard regarding why he had not been calling on Our Own Hardware. Porwoll responded that he had not been calling on the account because he had been sick. Henderson then asked Porwoll: "Paul, if you have been too sick to call on your customers, why didn't you take sick leave?" Porwoll replied: "I was afraid that it would look like I wasn't doing the job."

After the meeting with the buyers, on the way back to the hotel, Porwoll explained his medical problems to Williams. He told Williams that his back problems and diabetic condition had been worsening, that he had been having trouble keeping up the pace of the job, and that he had been too sick to make personal calls on Our Own Hardware. He did not at this time claim that he had been servicing Our Own by telephone. Williams and Henderson indicated to Porwoll that his failure to call on a major customer was a serious matter and that his job was in jeopardy.

Before returning to Denver, Williams called his secretary and asked her to pull Porwoll's call reports and expense reports for late 1979 and early 1980. The following day, April 25, Williams and Henderson reviewed the reports. They indicated that Porwoll had been reporting personal calls on Our Own Hardware, business lunches with Our Own buyers, and mileage for sales activity related to Our Own for the period he had admittedly never called on Our Own, and had been charging Gates for the expenses.

After reviewing the expense reports, Williams told Henderson to call Porwoll and terminate him. Henderson called Porwoll and asked for his resignation. Porwoll responded that he needed to seek the advice of an attorney. Henderson replied that he could consult an attorney, but he'd like Porwoll to resign because he thought it would be easier for him. Henderson testified that he told Porwoll at this time that under no circumstances would he be an employee of the Gates Rubber Company.

On that same day, Jack Williams prepared a memorandum indicating that he was moving to terminate Porwoll immediately on the basis of the events of the previous day and as a result of his review of Porwoll's falsified expense reports.

Porwoll admitted that he had falsified his expense reports, his call reports, and other matters related to Our Own Hardware, but testified that he had been authorized to do so by a deceased company representative as a means of being repaid for distribution of samples to customers. Such a procedure had never been authorized.

Later in the afternoon on Friday, April 25, 1980, after Henderson told Porwoll that he should resign and, according to Henderson's testimony, that he was no longer employed by Gates, Porwoll called Henderson back and proposed a plan whereby he would use up his sick leave and then his extended sick leave and come back to work for Gates when he had regained his health. Henderson testified that he told Porwoll that under no circumstances was that acceptable and that Porwoll had been terminated that morning. Porwoll admitted that Williams had said something to the effect that Porwoll's job was in jeopardy on Thursday, April 24, 1980.

In the Friday afternoon conversation, Henderson indicated to Porwoll that he was returning to Minneapolis on Monday, April 28, 1980, to start looking for a replacement for Porwoll. Porwoll asked to meet with Henderson and Henderson consented.

When Henderson arrived in Minneapolis on April 28, 1980, Porwoll met him at the airport; Porwoll requested sick leave and Henderson told Porwoll that was a legal matter. Porwoll asked whether he could buy his car from the company, and inquired about other matters regarding the settlement of Porwoll's affairs with Gates Rubber.

Gates had an internal guideline entitled "Termination Policy-Field Sales" in effect at the time of Porwoll's termination. It provided:

When it is necessary that the employee's services be discharged or terminated due to inadequacies, or negative factors *other than those listed in the following paragraph*, which lead to the necessity for discharge, the employee is entitled to

One week's pay (salary only) in lieu of notice if *more* than 60 days, but *less* than one year of continuous service

Two weeks' pay (salary only) in lieu of notice if *more* than one year of continuous service

If the employee has one year or more of continuous service, he shall be paid (salary only) for all vacation time as stated above.

In case of discharge for reasons such as dishonesty, misconduct, incompetence, or other serious cause no pay (salary) in lieu of notice is required * * *.

(Emphasis in original.)

The same "termination policy guideline" provides that, upon an employee's termination or resignation, he shall be paid for all vacation time accrued by him up to his last anniversary date for which he has not received payment. The company policy on payment of sick leave for the consumer products division, in effect at the time of Porwoll's termination, read as follows:

The purpose of paid sick leave is to tide employees through a period of misfortune over which they have no control by allowing them a limited time off with pay. Sick leave is not an earned right to be used by them at their discretion. *It is no way considered in the same light as vacation.*

(Emphasis added.) The same document provides payment for accumulated vaca-

tion, unused, when an employee is in good standing and resigns or is terminated, the same as the language in the termination policy noted above. There is no provision in the policy for payment for unused sick leave.

Porwoll admitted that an employee could use sick leave "as long as you stayed with the company." He also admitted that no one at Gates ever told him that if he quit or was discharged from his employment he would be entitled to be paid for accumulated sick leave. Likewise, his understanding of extended sick leave was that only employees could use extended sick leave.

At the time of his termination, Porwoll was insured under a salary continuation insurance plan which he apparently purchased through the company. He testified that he paid the premiums for this insurance on his own. Although an informational brochure describing the plan was introduced into evidence, there is no copy of the policy or plan document in the record.

### ISSUES

1. Was plaintiff an at-will employee of defendant?

2. Is plaintiff entitled to his accumulated employment benefits regardless of the reason for his termination?

3. Is defendant equitably estopped from claiming a right to terminate plaintiff for failing to call on a major customer for six months?

### ANALYSIS

■ 1. Generally, where a hiring is for an indefinite term, as it was here, the employment is "at will." In an at-will employment relationship, the employer can discharge the employee at any time without cause. *See Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). An at-will employment contract can be modified, however, to provide for termination only for cause where the employer communicates the changed conditions to the employee and the employee accepts the unilateral offer by

remaining on the job even though he is free to leave. *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626–27 (Minn.1983).

In *Pine River,* the supreme court held that a "disciplinary policy" contained in an employee handbook distributed after the plaintiff's employment began became part of the employment contract. The policy provided for a three-stage procedure consisting of reprimands for the first and second offenses and termination thereafter only "for an employee whose conduct does not improve as a result of the previous action taken." *Id.* at 626 & n. 3. The court held that the defendant wrongfully terminated the plaintiff by terminating him without following the procedures outlined in the handbook.

Here, on the other hand, the "termination policy" at issue does not set forth any procedure to be followed *before* termination. Nor does it provide that an employee may only be terminated "for cause." It merely sets forth the amounts of severance pay and vacation benefits to which an employee is entitled upon termination.

The trial court found that the termination policy

addresses only three circumstances under which employees are terminated. First, resignation by the employee; second, termination due to "inadequacies or negative factors"; third, termination for "serious cause." There is no company policy regarding cause. Therefore, any termination of an employee by Gates must be for cause. If there is no cause, the termination is wrongful.

■ It is true that the termination policy discusses the severance benefits payable to a terminated employee only in the context of these three circumstances. The issue is whether this failure to address the severance benefits payable to an employee who is terminated without cause amounts to an implied promise that employees will be terminated only for cause. The interpretation of the contractual language is an issue of law for the court. *Hunt v. IBM Mid America Employees Federal Credit Union,* 384 N.W.2d 853, 856, 859 (Minn.1986).

In *Hunt,* the supreme court held that the employer's termination policy in an employment manual was too indefinite to form the basis of an enforceable employment contract. *Id.* at 856–57. The language at issue in *Hunt* provided:

YOU ARE THE KEY TO OUR SUCCESS:

\* \* \* \* \* \*

You can be assured that you will have every opportunity to develop your skills and learning power to the fullest extent with our Credit Union. In terms of hiring and promotion, our aim is to attract the best people and to encourage their peak development by promoting within according to performance.

\* \* \* \* \* \*

DISCIPLINARY ACTION

If an employee of the Credit Union is reprimanded or asked to make certain corrections in theif [sic] job performance they will be placed on probation and it will be documented and placed in their personnel file. Improvement must be shown or the employee may be terminated.

\* \* \* \* \* \*

DISCHARGE

In the event of a serious offense, an employee will be terminated immediately.

*Id.* at 855.

■ Here, the language at issue is even more indefinite as to termination policy than the language in *Hunt.* The language here does not even address the procedures to be followed in terminating an employee. It speaks only of the severance benefits available after termination. The fact that Gates' termination policy does not specifically address the severance benefits available when an employee is terminated without cause is insufficient as a matter of law to form the basis of an enforceable agreement that Porwoll would be terminated only for cause.

■ 2. The trial court found that Porwoll was entitled to damages in the amount of $126,877.75. This consists of the following:

| | |
|---|---:|
| Accumulated sick leave | $ 10,336.56 |
| Extended sick leave benefits | 12,500.00 |
| Salary continuation insurance | 91,000.00 |
| Medical benefit losses | 13,041.19 |
| Total | $126,877.75 |

The trial court's award of damages to Porwoll was based on its erroneous holding that Porwoll could only be terminated for cause and that Gates' termination of Porwoll was wrongful. Porwoll argues that even if he was an at-will employee, or even if his termination was not wrongful, he is still entitled to his employment benefits. We cannot decide this issue on appeal. It was not litigated at trial and is not implicit in the trial court's decision. Furthermore, the record before this court is not sufficient to enable us to make such a determination. Although evidence was introduced regarding Gates' sick leave policy, the trial court did not make a determination regarding the availability of payment for accumulated sick leave or extended sick leave when an at-will employee is terminated. The record contains copies of "summary plan descriptions" of Gates' medical and salary continuation insurance plans, but does not contain the plan document upon which coverage decisions would be based. We therefore remand to give the parties an opportunity to litigate at the trial level the issue of whether Porwoll is entitled to his employment benefits notwithstanding that he was an at-will employee and that he was terminated.

3. Porwoll argues that Gates is equitably estopped from claiming a right to terminate him based on his failure to call personally on Our Own Hardware, since it was Gates' directive to Porwoll to take part in the Pep Boys changeover that caused his physical deterioration, which in turn made him unable to call on Our Own in person.

Porwoll is raising this issue for the first time on appeal. It is well-established that "[a] reviewing court must limit itself to consideration of only those issues that the record shows were presented and considered by the trial court in deciding the

matter before it." *Thayer v. American Financial Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982).

## DECISION

The trial court is reversed and the matter is remanded for further proceedings in accordance with this opinion.