David L. CAMPBELL, Appellant,

v.

LEASEWAY CUSTOMIZED TRANSPORT, INC., Respondent.

No. C5–91–1821.

Court of Appeals of Minnesota.

April 14, 1992.

David L. Lillehaug, Leonard, Street & Deinard, Minneapolis, for appellant.

Thomas A. Keller, III, Kevin M. Busch, O'Connor & Hannan, Minneapolis, for respondent.

Considered and decided by FORSBERG, P.J., and KLAPHAKE and DAVIES, JJ.

## OPINION

FORSBERG, Judge.

David L. Campbell appeals a judgment entered upon directed verdict in his suit for wrongful termination and breach of contract against his former employer, respondent Leaseway Customized Transport, Inc. Campbell claimed Leaseway's employee handbook constituted a unilateral contract under *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983). The trial court found the evidence insufficient to create any fact question as to whether the terms of the employee handbook were communicated to Campbell, and whether the terms of the handbook were definite enough to form a contract. We reverse and remand.

## FACTS

In June 1989, Campbell was employed by Leaseway as a switcher at a Target Distribution Center in Fridley, Minnesota. A switcher drives a truck tractor and moves trailers within the warehouse yard at the direction of a dispatcher. Campbell had

been employed by Leaseway since 1985, and was 57 years old at the time of trial.

On June 28, 1989, Campbell received an oral instruction from the dispatcher to move a trailer. Campbell backed up to the wrong door and began the procedure. In the process, he smeared grease on his hands and shirt which, he claims, distracted him. He went to the cab to get a rag and wipe himself off. Apparently, he failed to undertake a number of safety precautions routinely done before moving a trailer.

He pulled the trailer out approximately 10 feet and heard someone "holler," whereupon he discovered a Target employee was in the trailer and although not injured, was quite upset as a result of the incident. Campbell immediately apologized and admitted he was at fault, noting he never made this mistake in the past. According to Campbell, other switchers, including Campbell's son, had made the same mistake and only received a warning letter as a result. Leaseway recognized similar incidents occurred in the past; however, they contend this was the only time it happened when a Target employee was inside the trailer.

The day after the incident, Campbell was called into the office of his supervisor, Gerald Greenbush. There is conflicting testimony in the record as to whether this meeting was intended to be a hearing. Greenbush testified he did not consider it to be a hearing; however, Campbell indicated he thought it might be a hearing. In any case, a decision had already been made by Greenbush's superior to suspend Campbell.

Campbell tried to explain to Greenbush the circumstances surrounding the incident, but Greenbush told him there could be no excuses. Greenbush suspended Campbell without pay for five days and temporarily reassigned him to a less desirable job delivering goods from the distribution center to Target stores.

Greenbush testified he did not believe Campbell's mistake was a "flagrant violation" of company rules. He also indicated Campbell had been a conscientious and effective employee throughout his tenure with Leaseway.

On July 6, 1989, Campbell went back to the distribution center to pick up his check for the previous week. At that time he was told he was not only banned from the Target Distribution Center, but would not be allowed contact with any of the Target operations. He was therefore placed on "permanent layoff" status since all of Leaseway's contracts in the area involved Target. After six months, the permanent layoff became a termination.

Throughout Campbell's employment, Leaseway made available the "Leaseway Employee Handbook." Campbell sued Leaseway, contending the handbook established a unilateral contract as recognized in *Pine River*. After four days of trial, the trial court granted Leaseway a directed verdict, finding there was inadequate distribution of the handbook and the terms were not sufficiently definite to establish a contract. Campbell appeals from entry of that judgment.

## ISSUES

1. Did the trial court err by finding, as a matter of law, the handbook did not satisfy the *Pine River* criteria for establishment of a unilateral employment contract?

2. Is an employer relieved of contractual liability for breach due to third party contractual relations?

3. Did the trial court err by finding, as a matter of law, the employer met its obligations to undertake specific procedures prior to terminating an employee?

## ANALYSIS

■ 1. Where, as here, an employee is relying on the language contained in an employee handbook, the determination of whether the handbook constitutes a contract is a matter of law. *See Hunt v. IBM Mid America Employees Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn.1986). This court exercises *de novo* review on such matters of law. Further, this case is an appeal from directed verdict.

[A] directed verdict is appropriate only in exceptional cases. The motion for a

directed verdict presents a question of law on the sufficiency of the evidence to raise a fact question for the jury's decision. A directed verdict is sustainable only if it clearly would be the duty of the trial court to set aside a contrary verdict, as against the evidence or contrary to the law of the case. In reviewing the directed verdict, the appellate court must make an independent determination of the sufficiency of the evidence to present a fact question for the jury.

*Kulkay v. Allied Cent. Stores, Inc.*, 398 N.W.2d 573, 579 (Minn.App.1986) (citations omitted), *pet. for rev. denied* (Minn. Feb. 13, 1987), *disagreed with on other grounds by Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 841 n. 17 (Minn.1988).

■ Minnesota was among the first states to recognize employee handbooks, under certain circumstances, as binding contractual terms in an otherwise "at-will" employment situation. To form such a contract, the handbook must pass a two-pronged test evidenced by objective criteria.

Generally speaking, a promise of employment on particular terms of unspecified duration, if in form an offer, and if accepted by the employee, may create a binding unilateral contract. The offer must be definite in form and must be communicated to the offeree. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions.

*Pine River*, 333 N.W.2d at 626.

■ The trial court in this case found the first prong of this test, i.e., distribution, was not established by appellant at the close of his case:

First of all, it is questionable whether the terms of the handbook were sufficiently communicated to modify plaintiff's at-will employment status. Gerald Greenbush testified that employees were expected to follow the terms of the handbook. There is no evidence, however, that plaintiff ever received a personal copy of the handbook. * * * Plaintiff only admits that, sometime during his employment, he looked at a copy of the handbook in the break-room. Plaintiff did not, however, submit any information whether this handbook belonged to another driver or if it was placed in the break-room by defendant.

We disagree. The evidence is sufficient to at least present a jury question as to whether the handbook was distributed to appellant. Numerous copies were left in the break room, where it was known employees would have access to the handbook. Campbell testified he read the handbook there, and specifically that he read section 10, dealing with disciplinary procedures. There was no admonition against employees taking copies of the handbook for personal use. To the contrary, there was a blank proof of receipt included on the back page of each handbook. Under these circumstances, reasonable minds could differ as to whether the handbook was distributed to Campbell. The jury may well have found the employer should be compelled to take the good with the bad. A reasonable conclusion is that an employer cannot claim distribution, and therefore general applicability, when it provides a benefit, but disclaim distribution when used in favor of the employee.

■ We also disagree with the trial court's conclusion that the handbook terms lacked sufficient definiteness to constitute an offer to enter into a unilateral contract. In large part, the trial court depended on the case of *Hunt.* In *Hunt*, 384 N.W.2d at 857, the supreme court found indefinite a provision stating: "In the event of a serious offense, an employee will be terminated immediately." The supreme court reasoned:

Significantly, the manual neither defines nor gives examples of what is a "serious offense." This vagueness falls far short of the specificity necessary for a contractual offer under principles enunciated in *Pine River*. If this case were to go to trial, a jury would literally be asked to draft new contractual terms and define "serious offense." The jury, then, rather than the employer, would decide what offenses are serious enough to mer-

it discharge and whether Hunt's [behavior] was such an offense.

*Id.*

The trial court here decided the "flagrant violation" language was essentially identical to the "serious offense" language in the handbook involved in *Hunt*. The specific language presently under consideration is found in section 10 of the handbook. It lists reasons for suspension or discharge and states no final notice need be given an employee if suspended or discharged for any of the following reasons:

  a) Gross insubordination.

  b) Dishonesty.

  c) Drunkenness, drinking on the property or dangerous drug abuse.

  d) Fighting.

  e) Flagrant and/or repeated violations of company rules and regulations.

This list plainly cures any difficulty associated with the *Hunt* case. *See Kulkay*, 398 N.W.2d at 577 (list of examples in handbook of "major breaches of policy" furnished context for defining such a breach, and provided degree of detail lacking in *Hunt*). First, all of the listed examples involve serious, *intentional* acts while on the job. Thus, "flagrant" in this context, as well as in general usage, would imply some intentional act, which all parties agree was missing in appellant's offense.

■ Additionally, as noted in *Pine River*, 333 N.W.2d at 626, whether the language of a handbook is meant to be an offer may be ascertained from the conduct of the parties. In this case, evidence of other incidents was presented in which the wrong trailer was moved in the switching yard. This evidence showed the offending employees were not suspended or terminated, but were merely issued a warning letter, as provided under the terms of the handbook. The trial court's attempt to distinguish those incidents from Campbell's because they did not involve physical injury is simply mistaken. There is no evidence, nor even allegation, in the record that anyone was actually injured as a result of this incident. Thus, we believe the trial court

erred in concluding the language of the handbook failed to constitute an offer under *Pine River*.

■ Finally, even if the handbook language which defines a violation is somewhat indefinite, a contract may still be formed if the *procedures* for finding a violation are described with adequate definiteness. We find this case is consistent with a previous case where

  [t]he language used clearly limits the right to freely dismiss employees and plainly states that in certain circumstances all employees are entitled to a warning and to a probationary period prior to dismissal. Further, the handbook states that only "serious misconduct" can constitute a ground for immediate dismissal. While the handbook does not contemplate every possible question regarding procedures for employee dismissals, the language is definite enough to permit a jury to conclude that plaintiffs received certain contractual rights. The precise nature of those rights is unclear, but where the terms of a contract are unclear, it is for a jury to determine the intent of the parties.

*Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 883 (Minn.1986).

■ 2. Next, the trial court found the termination was somehow justified by Leaseway's relationship with Target, and Target's request that Campbell be taken off its operations. However, even if Leaseway was "justified" in terminating appellant to please Target, that does not necessarily mean it should be immunized from the negative effects of this business decision. The trial court seems to be subscribing to a distortion of the theory of "efficient breach." *See* Richard Posner, *Economic Analysis of Law* § 4.9, at 88–92 (2d ed. 1977) (party may be immunized from contractual remedies when breach is socially beneficial because breaching party's gain exceeds victim's loss). This distortion does not reflect current contract law in Minnesota. Such a quantum change in the law of contracts could properly be effected by our supreme court. We do not believe this novel adaptation of the theory was

properly applied by the trial court on a motion for directed verdict.

3. Finally, the trial court reasoned:

Even if defendant was not justified in placing plaintiff on lay-off status, or the lay-off status was in reality a termination, there is insufficient evidence showing defendant failed to comply with handbook procedures when terminating an employee without written warning.

The trial court notes there was a meeting between Greenbush and appellant before the suspension. There is testimony that appellant thought, more or less, that this constituted a hearing. However, there is also testimony that Greenbush, acting as agent for Leaseway, did not consider the initial meeting a hearing within the contemplation of the handbook. Although the trial court notes Leaseway was in fact given an opportunity to hear "both sides of the story" as required by the handbook, Campbell testified Greenbush told him the circumstances or excuses were of no consequence.

Once again, whether the procedural requirements of the handbook were met by the meeting the day after the incident is properly a question for the jury. As noted, there is conflicting evidence on this issue, and the trial court wrongly removed it from the jury.

### DECISION

The trial court improperly granted Leaseway's motion for directed verdict where issues of fact remained for jury determination. The judgment of the district court is therefore reversed.

Reversed and remanded.