*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1311**

Martin Bell, et al,
Appellants,

vs.

Leonard Street and Deinard Professional Association, et al.,
Respondents.

**Filed May 2, 2016
Affirmed
Smith, John, Judge**[*]

Hennepin County District Court
File No. 27-CV-13-18423

Stephen F. Rufer, Kendra E. Olsen, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, Minnesota (for appellants)

Joseph W. Anthony, Brooke D. Anthony, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, Minnesota (for respondents)

        Considered and decided by Bjorkman, Presiding Judge; Cleary, Chief Judge; and Smith, John, Judge.

_____

[*]  Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH,** John, Judge

We affirm the grant of respondents' summary-judgment motion because appellant Martin Bell ratified his attorneys' agreement to postpone the closing date of the property transaction for which appellants retained their services, thereby precluding appellants from asserting a malpractice claim based on the postponement.

## FACTS

This appeal arises from Martin and Ginger Bell's legal-malpractice action against respondents, Leonard, Street, and Deinard Professional Association, Thomas Nelson, Anne Cotter, and Thomas Sanders.

### *Underlying Litigation*

The Bells retained Leonard Street in February 2010 for assistance in resolving an ownership dispute with the Toberman family over Bel Clare Estates, Inc., which owns a mobile-home park. At the time, the Bells and the Tobermans each owned fifty percent of the shares in Bel Clare.

At mediation in June 2010, the Bells and the Tobermans agreed to two possible "pathways" by which the parties would consolidate ownership of Bel Clare in one of the two families. Each party entered mediation having expressed a desire to purchase the other's shares in Bel Clare. Under the first pathway of the parties' settlement agreement, the Tobermans would buy the Bells' interest in Bel Clare for $700,000. Alternatively, if

the Tobermans could not consummate the sale, the Bells would have the right to buy the Tobermans' interest for $350,000.[1]

Following mediation, respondent Thomas Nelson, a Leonard Street attorney who represented the Bells in the transaction, summarized the terms of the parties' mediated settlement agreement in a letter to the Tobermans' attorney, William Skolnick, and the mediator. Nelson's letter confirmed the terms of the settlement agreement, establishing the two agreed-upon "pathways." Regarding the presumptive scenario, the Tobermans' purchase of the Bells' shares, the agreement provided that the Tobermans would "have up to 90 days for 'due diligence' activities." It further stated that "[u]pon the completion of 'due diligence,' the parties will then have up to 30 days to close on this transaction— meaning up to or before November 15 (depending on how quickly we can get the agreement documents completed and signed, and how quickly 'due diligence' can be performed.)" The parties and the mediator agreed that Nelson's summary properly reflected the outcome of mediation and accurately described the two possible pathways of consolidating ownership of Bel Clare.

The parties progressed toward consummating the transaction in the months following mediation, but the record shows that the contemplated closing date was never made firm. Nelson emailed Martin Bell[2] a draft stock-purchase agreement on July 14, and

---

[1] The discrepancy in purchase price, though irrelevant to our decision, arose from the Tobermans' indebtedness to the Bells at the time of mediation.

[2] Martin Bell was the primary contact person for litigation matters; accordingly, "Bell" refers to Martin Bell. "The Bells" refers to Martin and Ginger Bell jointly, as parties to the lawsuit.

Bell replied that he wanted to address mortgage-related issues before reviewing or approving the final agreement. In September, Nelson relayed to Bell that Skolnick had requested an additional two weeks to close on the transaction. When Nelson emailed Bell a subsequent draft stock-purchase agreement on October 4, Nelson commented that the parties were "still aiming at a November 15 or thereabouts closing," and the draft stock-purchase agreement specified November 29, 2010, as the closing date. Bell replied that "[e]verything look[ed] okay." Later in October, Nelson emailed Bell, first referring to a "November 15 or thereabouts closing," then stating that "it looks as if the closing will be between November 15 and November 29, depending upon schedules and availability."

On October 29, despite acknowledging earlier that he had provided Nelson all relevant loan documents, Bell sent Nelson a loan agreement between Bel Clare and Collateral Mortgage, expressing concern that he could be personally liable as an indemnitor under its terms. This was the first that Nelson was made aware of the document. Three days later, Nelson alerted Skolnick to its existence; Skolnick had also been unaware of it until then. Bell insisted that he be removed from the mortgage and released from his personal guarantee under the newly disclosed loan document. According to Skolnick, Bell's demand prevented the Tobermans from closing on the originally agreed-upon date, which they intended, and were able, to do.

On November 11, Skolnick conveyed to respondent Anne Cotter, who had assisted in drafting the stock-purchase agreement, that, if the Bells forced the Tobermans to close by November 15, Skolnick "would immediately bring a lawsuit against the Bells." Skolnick stressed to Cotter that the closing date was dependent upon successful completion

4

of due diligence and Bell had not previously disclosed the loan document from which he was now demanding to be released. Cotter informed Nelson that Skolnick wanted confirmation that the Bells would agree to postpone the closing beyond November 15. Nelson then emailed Bell about several issues, including requesting confirmation of the delayed closing date "by mutual agreement of the respective parties so as to allow the continuing finalization of the transaction documents." Nelson did not consider the postponement an extension because the parties had not yet signed a stock-purchase agreement.

Aware of the Bells' desire to avoid litigation with the Tobermans, Nelson emailed Skolnick on November 12—before hearing back from Bell—to confirm the postponement of the closing date, to allow the parties to finalize the terms of the deal. Once Nelson sent the email, he forwarded it to Bell. Bell immediately replied that Nelson "ha[d] no authority" to postpone the closing. Bell confirmed to Nelson that he still wanted to complete the deal but would only sign an agreement if it stated "due by November 29—period."

On November 18, Nelson explained to Bell that he did not believe the mediated settlement agreement created an enforceable closing date. As a possible alternative closing date, Nelson suggested December 31, 2010. On November 30, Bell instructed Nelson that, if he could not "get the matter adjusted" to conform to the original terms of mediation, Nelson was to "stop the music and contact [the mediator] for immediate mediation." Bell later informed Leonard Street that he was considering a malpractice claim based on its representation in the Bel Clare transaction.

5

On January 7, 2011, despite the potential conflict of interest with Leonard Street because of Bell's malpractice allegations, the Bells entered into a second representation agreement with Leonard Street. Under the new agreement, Leonard Street would assist in consummating the transaction contemplated by the parties' June 2010 mediation. Respondent Thomas Sanders signed the agreement on behalf of Leonard Street and resumed representation of the Bells in the Bel Clare transaction.

The parties returned to mediation after the Bells and Leonard Street finalized the new representation agreement. While working with Sanders to consummate the transaction, Bell agreed to extend the closing date to January 31, then to February 10, and finally to February 28. On February 22, 2011, the Bells signed a stock-purchase and settlement agreement, selling their interest in Bel Clare to the Tobermans for $700,000. Additionally under the stock-purchase and settlement agreement, the Tobermans secured Bell's release from the Bel Clare mortgage and note and indemnified Bell. Leonard Street concluded its representation of the Bells on March 1, 2011.

### *Malpractice Action*

The Bells brought the instant legal malpractice action against respondents in October 2013, alleging negligence, breach of contract, and breach of fiduciary duty. In August 2014, respondents moved for summary judgment on the Bells' claims. The district court granted respondents' summary-judgment motion, dismissing the Bells' complaint with prejudice. The Bells appeal.

6

**D E C I S I O N**

On a motion for summary judgment, "[j]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, this court reviews whether any genuine issues of material fact remain and whether the district court erred in its application of the law. *Dahlin v. Kroening*, 796 N.W.2d 503, 504 (Minn. 2011).

We review the existence of genuine issues of material fact de novo. *STAR Centers, Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002). We also review de novo whether the district court erred in its application of the law. *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). "[W]e view the evidence in the light most favorable to the party against whom summary judgment was granted." *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007) (quotation omitted). The party opposing summary judgment "cannot rely upon mere general statements of fact but rather must demonstrate at the time the motion is made that specific facts are in existence which create a genuine issue for trial." *Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 855 (Minn. 1986).

The Bells asserted three claims in their complaint—negligence, breach of contract, and breach of fiduciary duty—each of which requires proof of the same four elements required of a legal malpractice claim. *See Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 281 (Minn. 1983) (applying four malpractice elements to analysis of negligence-based

7

malpractice claim).  A plaintiff suing for legal malpractice arising out of representation in a transactional matter must prove four elements: "(1) an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts proximately caused the plaintiff's damages; and (4) that but for the defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained." *Schmitz v. Rinke, Noonan, Smoley, Deter, Colombo, Wiant, Von Korff & Hobbs, Ltd.*, 783 N.W.2d 733, 738 (Minn. App. 2010), *review denied* (Minn. Sept. 21, 2010).

The Bells' malpractice theory was that respondents failed to advocate that the November 15, 2010 closing date was an enforceable term of the June 2010 mediated settlement agreement, depriving the Bells of the opportunity to purchase the Toberman shares in Bel Clare.  Specifically, to establish causation, the Bells asserted that Nelson was not authorized to agree to a postponement of the closing date, and without such postponement, the Tobermans would have been forced to sell to the Bells, rather than buy the Bells' shares.

A principal's conduct following his agent's purportedly unauthorized action, however, may estop him from later asserting a claim for negligence or breach based on the unauthorized action.  *See* Restatement (Second) of Contracts § 380 cmt. (1981) ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contact."); Restatement (Third) of Agency § 4.02 cmt (b) (2006) ("Ratification recasts those legal relations as they would have been had the agent acted with actual authority. Legal consequences thus 'relate back' to the time the agent acted."); *see, e.g.*, *Acrometal Companies, Inc. v. First Am. Bank of Brainerd*, 475 N.W.2d 487, 493 (Minn.

8

App. 1991) (concluding that originally unauthorized signature was ratified when principal assented to the signature by its conduct). If a party ratifies[3] an originally unauthorized agreement, proof of ratification will defeat a claim for malpractice based on such unauthorized agreement. *See Anderson v. First Nat'l Bank of Pine City,* 303 Minn. 408, 410, 228 N.W.2d 257, 259 (1975) (noting that principal's ratification of agent's originally unauthorized act bound principal to the act).

A district court may conclude that a party has ratified an agreement if the party "give[s] sanction and validity to something done without authority." *Steffens v. Nelson,* 94 Minn. 365, 368, 102 N.W. 871, 873 (1905) (quotation omitted). "Ratification occurs when one, having full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another, thereby creating an agency relationship and binding the principal by the act of his agent as though that act had been done with prior authority." *Anderson*, 303 Minn. at 410, 228 N.W.2d at 259.

Here, the district court concluded that the Bells' malpractice claims failed in at least two critical respects at the summary-judgment stage: ratification and lack of but-for causation. Regarding ratification, the district court found that the Bells "approved of or acquiesced in postponing the closing date on at least two occasions." First, they endorsed a February 2, 2011 letter to the mediator that summarized their agreement to an extension until as late as February 28, 2011, reflecting four authorized extensions. Second, they

---

[3] Ratification is "the confirmation of a contract performed or entered into on one's behalf by another who at the time assumed without authority to act as an agent." Bryan A. Garner, *Garner's Dictionary of Legal Usage*, 29 (3d ed. 2011).

approved the postponement "by executing the Stock Purchase and Settlement Agreement that provided for a closing date of February 28, 201[1]."

On appeal, the Bells argue that whether they ratified the postponed closing date presents a genuine issue of material fact. They contend that ratification cannot apply because they did not benefit from the transaction, respondents failed to advise the Bells that consummating the transaction would bar a future malpractice claim, and Bell could not have repudiated Nelson's unauthorized action because he was unaware of the option to repudiate. We disagree.

The record supports the district court's findings on ratification. Regarding the February 2, 2011 letter to the mediator, Bell received a copy of the letter before it was sent and he expressly approved of its terms, including the summary of the extensions he authorized. Further, the Bells ultimately consummated the postponed transaction by signing the stock-purchase and settlement agreement. Moreover, the stock-purchase and settlement agreement contained an integration clause stating that the agreement "constitute[d] the entire understanding and agreement of the parties" and "supersede[d] all prior and contemporaneous agreements or understandings."

The record further belies the Bells' arguments challenging ratification. First, the Bells indisputably benefitted from the transaction, because, as respondents note, they "had no legal right to payment" until the mediated settlement agreement was finalized by signing the stock-purchase and settlement agreement. Moreover, postponing the closing date allowed the Bells to receive all the benefits originally contemplated in the mediated settlement agreement: they obtained the payment for their shares in Bel Clare, they secured

Bell's release from the mortgage, and they avoided litigation regarding Bel Clare with the Tobermans. This outcome comported with the goals outlined in the original representation agreement.

Further, respondents had no duty to advise the Bells of the consequences of consummating the transaction on any future malpractice claims. In their renewed representation agreement, the Bells signed a conflict waiver acknowledging that respondents' continued representation would not be for the purpose of advising them on any future malpractice claims but only for the limited purpose of consummating the transaction.

Finally, the record shows that Bell knew how to repudiate his attorney's actions and that he was indeed aware of this option had he chosen to exercise it. Once Nelson agreed to the postponement, Bell initially repudiated the postponement in his November 12, 2010 email to Nelson within minutes of receiving Nelson's email. Additionally, the record shows that he was well advised of his legal options.

Given these considerations, the undisputed facts on summary judgment established that the Bells ratified the extension of the transaction closing date. The Bells were therefore precluded from asserting their malpractice theory, and summary judgment was properly granted. Because we affirm the grant of summary judgment in favor of respondents, we do not reach the Bells' remaining arguments.

**Affirmed.**

11