ROBERT A. MAU, APPELLANT, V.
THE OMAHA NATIONAL BANK, APPELLEE.

299 N.W.2d 147

Filed November 21, 1980.  No. 43024.

John H. Kellogg, Jr., for appellant.

Janet Tungland and Soren S. Jensen of Swarr, May, Smith & Andersen for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, District Judge.

BRODKEY, J.

This is an action by Robert L. Mau, plaintiff-appellant, seeking damages for his allegedly wrongful discharge from employment by the defendant-appellee, the Omaha National Bank. The plaintiff's claim for damages was dismissed by the District Court for Douglas County, Nebraska. We affirm.

The facts relevant to this appeal indicate that Mau had been employed by the defendant for 28 years prior to his termination on December 3, 1976. There was no written contract of employment entered with the bank, but the basic terms of his employment in 1948 were a starting salary of $100 per month, a work week of 40 hours, and 2 weeks vacation time to which he would be entitled after 1 year of employment. The plaintiff also participated in the appellee's retirement program and profit-sharing plan, and received health

insurance benefits from the bank. The plaintiff served in various capacities within the bank, and was supervisor of the mailroom at the time of his discharge. As supervisor, Mau was responsible for the delivery of incoming mail to the various departments within the bank and for processing the mail distributions sent out by the appellee. In addition, Mau was given supervisory responsibility over the bank's automobile pool.

The record reveals that the circumstances which led to the plaintiff's discharge centered around his failure to mail approximately 300 pension checks issued from accounts administered by the trust department of the bank. Upon receipt of numerous complaints regarding the nonreceipt of the checks, Mau's immediate supervisor inquired as to the whereabouts of the checks. Over the next 3 days, Mau repeatedly assured his supervisor that the checks had, in fact, been mailed. However, upon instruction to conduct a personal search of the mailroom, the appellant found the checks in a desk drawer. Shortly thereafter, Mau was terminated from employment by the appellee.

On April 19, 1978, the plaintiff filed a petition seeking damages for his wrongful discharge from employment. While the length of his contract of employment, as set out in his petition, is somewhat ambiguous, his first cause of action alleged that he had a contract with the defendant which guaranteed him employment either for life or to age 65. The remainder of plaintiff's petition, which alleged defamation of character and wrongful discharge based on age discrimination, was dismissed prior to the trial held on September 12 and 13, 1979. At the close of plaintiff's evidence at trial, the defendant made a motion for dismissal and a directed verdict, which was granted by the court on September 13, 1979. It is in the trial court's finding that the employment relationship between the parties was terminable at will, and that Mau's discharge was not in violation of public policy, that the appellant alleges error.

It is the contention of the plaintiff that, although no formal agreement was ever executed between the parties, a contract of employment was established, not only by the conversations between the parties, but also by the bank handbook and other publications and statements made to the appellant during the course of his employment. Mau testified at trial that he had been offered a *career* by the bank which was to last until retirement at age 65.

His testimony, as revealed by the record, was as follows:

"Q. [W]hat were the representations that [the bank] made to you when you first came into the bank with regards to what you could or could not expect if you took AIB [American Institute of Banking] courses?

"A. Well, they stressed the fact that they would like to have me take AIB courses because they better yourself and your career at the bank.

. . . .

"Q. Did he discuss with you then a career with the bank at that time?

"A. Yes, in a sense he did.

"Q. Did he discuss with you what a career meant at that time?

"A. That it was a way of bettering — well, what a career meant — it was a way of bettering yourself and being able to stay at the bank.

"Q. How long?

"A. Until you were sixty-five.

. . . .

"Q. Can you relate to us what you remember from the discussion with Mr. Alvison when you entered the bank in 1948?

"A. Just that they were glad to have me aboard and they told me, 'Now, we would like to have you stay here and, if you do stay here, we would like to have you take these courses like AIB,' and he stressed also, 'We have a pension plan here and, you know, we would just like to have you aboard here and start your career here.'"

Upon cross-examination, appellee's counsel inquired further into the formation of the contract, and the following dialogue took place:

"Q. When was this contract entered into between you and the bank?

"A. Well, right from the start. The first day I was told about the pension.

"Q. So the contract started the first day that you went to work there?

"A. Yes.

"Q. Was this contractual agreement, which you are talking about between yourself and the Omaha National Bank, did it change from time to time?

"A. Yes, it did. It was always made better.

"Q. Did you agree to all of these changes?

"A. Absolutely, they were in my favor.

"Q. Did you sign a piece of paper that each time you agreed to it?

"A. No.

. . . .

"Q. Did you ever have any meeting with any officer of the Omaha National Bank or any manager of the Omaha National Bank where you were asked to sign a piece of paper or any kind of memorandum which would indicate that you would have employment with the Omaha National Bank until the age of sixty-five?

"A. No."

It is clear that there was no specific agreement for the employment of the plaintiff until age 65. The plaintiff further contended that he manifested his agreement to the terms of the employment contract by accepting "the terms of Defendants employment policies and contract and engaged in the performance of services for a period in excess of 28 years." Defendant alleged that, by his actions, he had a "career" with the Omaha National Bank which was guaranteed for life or until retirement at age 65. We do not agree.

The threshold issue before this court is whether an employee who has been hired for an indefinite period

of time may bring a claim against his employer for damages for wrongful discharge. The general rule has been stated to be that "a contract to give a person permanent employment, in the absence of some further express or implied stipulation as to the duration of the employment or of a good consideration in addition to the services contracted to be rendered, is no more than an indefinite general hiring terminable at the will of either party." 53 Am. Jur. 2d *Master and Servant* § 32 (1970). In addition, this court has previously held that: "If there is no contract for any. fixed term of employment, the employer may discharge, or the employee may stop work, at his own pleasure." *State v. Employers of Labor*, 102 Neb. 768, 772, 169 N.W. 717, 718 (1918). See, also, *Stewart v. North Side Produce Co.*, 197 Neb. 245, 248 N.W.2d 37 (1976); *Sinnett v. Hie Food Products, Inc.*, 185 Neb. 221, 174 N.W.2d 720 (1970); *Ploog v. Roberts Dairy Co.*, 122 Neb. 540, 240 N.W. 764 (1932). We note, however, that the case of *Sinnett v. Hie Food Products, Inc., supra*, is factually distinguishable from the present case because the plaintiff-employee in that case was suing for the recovery of a stock bonus allegedly due him at the time of his discharge from employment.

Plaintiff would have us find that his employment, or career, with the bank should be construed to mean a definite period such as life or until age 65, so as to avoid the "terminable at will" rule. This same argument was rejected by the Supreme Court of Kansas in *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976), a case very similar in nature to the one at bar. In *Johnson*, the plaintiff-employee, a beef lugger at the defendant's plant, sought to establish an employment contract by arguing that the employer's "Company Policy Manual" constituted an express contract with the employee, or, in the alternative, a basis for establishing a contract of employment by implication. The court stated: "Plaintiff argues that the statements referred to were bind-

ing on the defendant in its employment relationship, and that they fix the employment duration at life or until an employee reaches retirement age." *Id.* at 54, 551 P.2d at 782. In rejecting plaintiff's argument that the manual constituted a contract, the court said: "A copy of the manual has been supplied to us with the record on appeal. It appears to be a general statement of company policies dealing with employee's benefits, insurance, vacations, holidays, etc., as well as general operating procedures and plant rules. . . . We find nothing in the manual expressly providing for a fixed term of employment, nor is there language from which a contract to that effect could be inferred." *Id.* The court held that the terms of the employees' manual were not bargained for by the parties and that any benefits conferred by it were mere gratuities. The court also rejected the argument that permanent employment should be construed to mean life or until age 65, and concluded that "an agreement to give permanent employment simply means to give a steady job of some permanence, as distinguished from a temporary job or temporary employment." *Id.* at 55, 551 P.2d at 782.

We concur with the aforementioned statements of the Kansas Supreme Court as they apply to the factual circumstances in the present case. In the instant case, none of the company books or documents provided plaintiff promised any definite term of employment, but only pointed out fringe benefits to the employee *if* he remained employed by the bank; and in addition, most of the materials were furnished to defendant after he commenced employment. One booklet even specified in capital letters: "THIS BOOKLET IS NOT A CONTRACT." There is no question that the plaintiff has rendered services over a period of 28 years, and that the employer was bound to compensate him for services rendered and received. However, even assuming *arguendo* that the publications relied upon constituted part of an employment contract, in the absence of a promise on the part of the employer

that the employment should continue for a period of time that is definite or capable of determination, such employment relationship would still be terminable at the will of the employer as it constitutes an indefinite general hiring. See *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 153 N.W.2d 587 (1967); Annot., 35 A.L.R. 1432 (1925); Annot., 135 A.L.R. 646 (1941).

The general rule is that when the employment is not for a definite term, and there are no contractual or statutory restrictions upon the right of discharge, an employer may lawfully discharge an employee whenever and for whatever cause he chooses, without incurring liability. 53 Am. Jur. 2d *Master and Servant* § 43 (1970). Moreover, in the present case, we think it is clear that the plaintiff's discharge was not arbitrary or malicious, but for good cause. His termination was predicated upon the actions he took or failed to take, in regard to the lost pension checks. In reviewing this matter in a memorandum dated December 3, 1976, plaintiff's supervisor stated: "The major problem with regards to the termination is a situation that happened in the last couple of days. On Thursday, I was approached by the Trust Department regarding OPPD and Brandeis pension checks.

"Three hundred customers called in complaining that they did not receive their pension checks. I checked with the Mail Room and was assured that the pension checks were mailed out on Tuesday afternoon. Friday I was approached by Stan Traub regarding reissuing the pension checks. He stated that he talked with Bob Munnelly at the Post Office and asked him to trace them as he felt they were responsible for the loss of the checks. At that point, I talked with Bob Mau and instructed him to make sure that the checks were no where [sic] in the bank. Bob returned a few minutes later and stated he had found the 500 checks in a drawer in the Mail Room.

"I feel this is gross negligence on his part in not making sure that the checks were mailed."

Even if "good cause" for firing were required in this case, it is obvious that adequate cause existed at the time of plaintiff's discharge to support the decision made by the bank.

We recognize, however, that the "employment at will" rule is not, in some jurisdictions, an absolute bar to a claim of wrongful discharge. In a number of jurisdictions, an exception to the "terminable at will" rule has been articulated in recent years. Under this exception, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy. See, *Percival v. General Motors Corp.*, 539 F.2d 1126 (8th Cir. 1976); *Abrisz v. Pulley Freight Lines, Inc.*, 207 N.W.2d 454 (Iowa 1978); *Fortune v. National Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974); *Frampton v. Central Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973); *Petermann v. International Brotherhood of Teamsters*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959).

So far as we are able to ascertain, Nebraska has not adopted this exception to the present time. Assuming *arguendo*, however, that such an exception were to be recognized in this jurisdiction, it is clear in this case that the plaintiff has failed in his burden to prove that his discharge was violative of a public policy of this state. We have held that "[c]ourts should be cautious in holding contracts void on ground of public policy and before they do so prejudice to the public interest should clearly appear." *Beaver Lake Assn. v. Beaver Lake Corp.*, 200 Neb. 685, 691, 264 N.W.2d 871, 875 (1978). The authorities dealing with "public policy" cited by the plaintiff in support of his claim are factually distinguishable from the instant case. For example, in *Petermann v. International Brotherhood of Teamsters, supra*, the plaintiff-employee had been subpoenaed to testify before a state legislative committee and was instructed by his employer to give

false testimony. In reversing a judgment on the pleadings for the defendant, the court stated that coercing perjury is "patently contrary to the public welfare." *Id.* at 189, 344 P.2d at 27.

In *Frampton v. Central Ind. Gas Co.*, *supra*, the plaintiff-employee was fired after reporting an injury to her arm in order to file for workmen's compensation benefits. The court found that the employer's actions violated a statute prohibiting an employer from using any "device" to relieve himself of his liability under the workmen's compensation law.

In *Monge v. Beebe Rubber Co.*, *supra*, the plaintiff-employee claimed that she was fired because she had refused to go out with her foreman. The trial court held that "a termination by the employer . . . which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract." *Id.* at 133, 316 A.2d at 551.

The facts of the above cases are much stronger and clearer than those of the instant case on the question of violation of public policy. In this connection, see Annot., Employee's Arbitrary Dismissal as Breach of Employment Contract Terminable at Will, 62 A.L.R. 3d 271 (1975); Annot., Workmen's Compensation: Recovery for Discharge in Retaliation for Filing Claim, 63 A.L.R.3d 979 (1975); Case Note, 8 *Creighton L. Rev.* 700 (1975).

We conclude that the contract of employment between the plaintiff and the Omaha National Bank was clearly for an indefinite period of employment and was terminable at will, and that there is no evidence of any violation by the defendant of the public policy of Nebraska in plaintiff's discharge. Where the facts adduced to sustain a finding are such that but one conclusion can be drawn when related to the applicable law, the court should decide the question as a matter of law. *Mustion v. Ealy*, 201 Neb. 139, 266 N.W.2d 730 (1978). We conclude that the trial

court properly granted the defendant's motion for dismissal and a directed verdict, and its decision must be affirmed.

AFFIRMED.

BOSLAUGH, J., concurs in result.