JOHN R. JOHNSTON, APPELLANT AND CROSS-APPELLEE, V. PANHANDLE COOPERATIVE ASSOCIATION, A CORPORATION, APPELLEE AND CROSS-APPELLANT.

408 N.W.2d 261

Filed June 26, 1987.   No. 85-676.

Robert G. Simmons, Jr., of Wright, Simmons & Selzer, for appellant.

Robert P. Chaloupka of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

The plaintiff, John R. Johnston, appeals the judgment of the district court for Scotts Bluff County dismissing his petition for declaratory judgment at the close of all the evidence. Plaintiff filed the declaratory judgment action to determine whether he was still employed by the defendant, Panhandle Cooperative Association (Co-op).

The plaintiff was hired by the Co-op in 1970 as the company's auditor or controller. He worked for the Co-op until October 25, 1984, when his employment was terminated after he and the defendant's general manager disagreed over inventory procedures.

The district court dismissed plaintiff's petition for declaratory judgment and made the following findings: There

was no express or implied contract of employment; the conduct involved was not outrageous and did not violate any public policy; the plaintiff did not voluntarily resign; the defendant's general manager was authorized to discharge the plaintiff; and the plaintiff was terminated without good cause.

The plaintiff appeals, alleging that the court erred in finding that he was not still an employee of the defendant; in finding that he could be dismissed without cause, when the defendant asserted before trial that the plaintiff had resigned; in finding that there was an employment at will; and in finding that the plaintiff's discharge was not against public policy. In its cross-appeal defendant alleges that the court erred in determining that no cause existed for plaintiff's termination of employment.

The record reveals the following. Before Johnston was hired by the defendant, he worked for a company that performed audits on cooperative associations in Nebraska and Wyoming. In 1970 he was hired by the defendant, Co-op, to be in control of its administrative staff and, as Johnston testified, to be in charge of "[a]nything that pertained to money," including accounting procedures.

When Johnston was first hired by the defendant, Co-op, there was no written agreement drawn up. Sometime after Johnston was hired, the Co-op started a policy of annually providing some salaried employees, including Johnston, with a written statement setting out the employee's salary and commission rate for the coming year. In 1975, the Co-op prepared an "Employee Handbook of Personnel Policies for Panhandle Cooperative Association," which was periodically updated. It contained information about employee benefits, insurance, and vacations, as well as general procedures.

Carl Montgomery was the Co-op's director of the food division, a position on the same managerial level as Johnston's. In 1982 the Co-op's general manager became ill, and Montgomery acted as interim general manager or president. Johnston testified that he and Montgomery had disagreements at times, but generally got along all right. Montgomery testified that his relationship with Johnston was strained. The Co-op's personnel manager testified that he had observed considerable

rivalry and animosity between Johnston and Montgomery. The chairman of the Co-op's board of directors said that he had observed jealousy or a power struggle between the two men. An accountant who worked under Johnston's supervision stated that Johnston and Montgomery had a very strained relationship.

The Co-op's general manager died in September 1984. Johnston and Montgomery both applied for the position, and sometime in September of 1984 the Co-op's board of directors selected Montgomery for the job.

On October 24, 1984, Johnston delivered to Montgomery's office a financial statement containing information for the fiscal year 1984 annual report, including information on inventory.

Earlier, in the spring of 1984, some new members of the Co-op's board of directors had requested that a more accurate inventory be taken. The external auditors suggested changes in inventory procedures, and the board authorized that they be used. The board chairman testified that the inventory issue was a "little touchy" with the board.

After reviewing the financial statement that Johnston prepared in October of 1984, Montgomery noticed a change in the inventory procedures used by Johnston, which he, Montgomery, considered to be a violation of his orders not to change procedures without his prior consent.

The next day, Montgomery called Johnston in to discuss the financial statement and accused Johnston of changing the inventory without Montgomery's knowledge. It was during this conversation that Johnston was terminated. According to Johnston's testimony, Montgomery said that they should quit playing accounting games and suggested that Johnston seek other employment. Johnston asked, "Effective when," and Montgomery replied, "Right now." According to Montgomery's testimony, he and Johnston "exchanged words" and then Montgomery asked, "Bob [Johnston's nickname], do you think we ought to continue? Maybe we ought to call it quits." Montgomery said that Johnston replied, "When do you want to?" Montgomery answered, "Let's do it now. I'll pay you through November," and Johnston said, "You'll pay me a hell

of a lot more than that."

Shortly after this occurred, the Co-op's attorney wrote a letter to Johnston's attorney, stating that it was the Co-op's position that Johnston resigned his position as controller of the company.

This was a declaratory judgment action tried to the court by agreement of the parties. A declaratory judgment action is sui generis and may involve questions of both law and equity. *OB-GYN v. Blue Cross*, 219 Neb. 199, 361 N.W.2d 550 (1985). Insofar as fact questions are concerned in a declaratory judgment action, those issues may be tried and determined as in other civil actions. Neb. Rev. Stat. § 25-21,157 (Reissue 1985). All orders, judgments, and decrees under the declaratory judgments act may be reviewed as other orders, judgments, and decrees. Neb. Rev. Stat. § 25-21,155 (Reissue 1985). Whether a declaratory judgment action is to be treated as an action at law or in equity is to be determined by the nature of the dispute. *Boren v. State Farm Mut. Auto. Ins. Co., ante* p. 503, 406 N.W.2d 640 (1987).

Although plaintiff seeks damages for loss of wages and benefits under the terms of his prior employment, the basic issue in this case relates to the status of the parties; i.e., does an employee-employer relationship still exist? To determine this question it is necessary to determine whether a contract for permanent employment in favor of plaintiff existed. This is a question of law, and we have an obligation to reach an independent conclusion with respect to issues such as that without regard to the findings of the trial court. *OB-GYN v. Blue Cross, supra.*

Johnston's first and third assignments of error both involve the question of what kind of employment he had with the Co-op. Therefore, they will be discussed together. It is well established in Nebraska that when employment is not for a definite term, and there are no contractual or statutory restrictions upon the right of discharge, an employer may lawfully discharge an employee whenever and for whatever cause it chooses without incurring liability. *Jeffers v. Bishop Clarkson Memorial Hosp.*, 222 Neb. 829, 387 N.W.2d 692 (1986). The plaintiff contends that the employee handbook and

his salary agreement together constituted an express contract of employment for a definite term, that term being until his retirement or until he be dismissed for cause.

The salary agreement for 1984 established Johnston's base salary and commission for 1984. The agreement also stated that salary and commission agreements for 1985 would be established after completion of the fiscal yearend audit and before January 1, 1985. The agreement was signed by the plaintiff and by the Co-op's then general manager. This agreement is consistent with an employment at will and merely provides what the salary would be for the specific year if an employee was still employed.

The employee handbook was first developed in 1975, several years after Johnston was hired by the Co-op. It set out employee benefits and general company procedures, and was distributed to all employees. The portions of the handbook at issue in this case provided as follows:

### Dismissals For Cause

The following rules are intended to cover matters of fact rather than matters of judgement where you might make an honest mistake.

1. Willful insubordination or disregard of duty.

2. Dishonesty.

3. Unauthorized or unreported absence from work.

4. Use of beverage alcohol or illegal drugs on Company premises or Company time, or reporting for work under the influence.

5. Conduct which may cause damage or embarrassment to the Company.

6. Failure to comply with Company policy will be subject to dismissal.

To permit violation of these rules would, in fact, be an injustice to all employees and member-patrons.

    . . . .

### Probationary Period

The first three months of your employment with the association is a probationary period. This is an opportunity for you and the Association to determine whether your interests and abilities are compatible with

our business. You will not have the status of a permanent employee until the probationary period is completed. Then, if your record is acceptable, you will be credited with the probationary period wherever benefits may apply.

The handbook contained no provision for a grievance procedure.

The plaintiff contends that after the probationary period an employee becomes a "permanent employee," which means that he or she cannot be dismissed without cause as provided for in the section regarding dismissals for cause. The case presents the question of when provisions in an employee handbook can become part of an employment contract. In *Morris v. Lutheran Medical Center*, 215 Neb. 677, 340 N.W.2d 388 (1983), we concluded that the fact an employment contract was for an indefinite duration did not preclude job security provisions of the employer's "Policy and Procedures" handbook from becoming part of the employment contract. In *Morris* we cited *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983), as authority for the proposition that " '[t]here is no reason why the at-will presumption needs to be construed as a limit on the parties' freedom to contract.' " 215 Neb. at 680, 340 N.W.2d at 391.

The court in *Pine River* concluded that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract. *Pine River, supra.* Thus, if the handbook language constitutes an offer definite in form which is communicated to the offeree, and the offer is accepted and consideration furnished for its enforceability, the handbook provision becomes part of the employment contract. *Id.* In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. *Id.* The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer. *Id.*

We agree with the reasoning of the Minnesota court. Therefore, even though the handbook in this case was not prepared until 5 years after Johnston was hired by the Co-op, if its provisions meet the requirements for formation of a unilateral contract, they may become enforceable. To the extent that *Mau v. Omaha Nat. Bank*, 207 Neb. 308, 299 N.W.2d 147 (1980), suggests that a handbook issued after an employee is hired cannot become part of that employee's contract, it is disapproved.

In the present case, we reject Johnston's argument that the handbook provision providing for permanent employment status after a 3-month probationary period sets a definite term of employment lasting until retirement or dismissal for cause. The provision does not meet the requirement that an offer be definite in form. " '[A]n agreement to give permanent employment simply means to give a steady job of some permanence, as distinguished from a temporary job or temporary employment.' " *Mau v. Omaha Nat. Bank, supra* at 314, 299 N.W.2d at 150.

Larry Sayles, the Co-op's personnel manager, testified that the probationary period is used as a period in which the company has no obligation to keep an employee and the employee has no obligation to keep the job. He testified that after the probationary period an employee is eligible to receive sick leave and is reviewed for a possible raise, but that the personnel department has never treated employees as though they could not be terminated after probation except for certain reasons. We conclude that neither the employee handbook nor the salary agreement promised any definite term of employment, but only pointed out the benefits that Johnston would receive *if* he remained a Co-op employee. See *Mau v. Omaha Nat. Bank, supra.*

We also reject Johnston's argument that a contract of employment for a definite term can be implied from the circumstances surrounding his employment. Johnston was hired by the Co-op in 1970 by the company's then general manager, Roy Chelf. Chelf testified by deposition that he made no specific promises as to how long Johnston would be employed by the Co-op, nor did he enter into a contract with

Johnston that included conditions under which Johnston could be terminated. Johnston admits that he could not remember any specific promises made to him by Chelf and that it was never promised that Johnston would be employed for a certain term.

However, Johnston contends that when he was hired by the Co-op, he considered job security to be evident because of the number of Co-op employees and the length of their service. Johnston asserts that this "job security," in conjunction with the employee handbook and salary agreement, constitutes an implied employment contract continuing until his retirement or dismissal for cause. However, Johnston's subjective understanding of "job security" is insufficient to establish an implied contract of employment to that effect. See *Thompson v. St. Regis Paper Company*, 102 Wash. 2d 219, 685 P.2d 1081 (1984).

Because Johnston's employment was for an indefinite term, unless there were contractual or statutory restrictions on the right to discharge, the Co-op could lawfully discharge him whenever and for whatever cause it chose without incurring liability. See *Jeffers v. Bishop Clarkson Memorial Hosp.*, 222 Neb. 829, 387 N.W.2d 692 (1986). Johnston argues that the handbook provisions regarding the probationary period and dismissals for cause restrict the Co-op's right to discharge. As stated earlier, whether the provisions do become part of the contract depends on whether they meet the requirements for formation of a unilateral contract.

In *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983), the court determined that the language in the handbook section titled "Job Security" did not constitute any offer, but was no more than a general statement of policy. However, the court determined that the provisions of the handbook section titled "Disciplinary Policy" did set out in definite language an offer of a unilateral contract for procedures to be followed in job termination. *Id.* The section provided for a three-stage procedure consisting of reprimands for the first and second "offense," and thereafter suspension or discharge, but discharge only " 'for an employee whose conduct does not improve as a result of the previous action taken.' " *Id.* at 626.

The Minnesota Supreme Court thus concluded that the jury was justified in finding that the handbook provision on disciplinary procedures had become part of the plaintiff's employment contract. *Id.*

In a subsequent case involving the question of whether handbook provisions became part of an employment contract, the Minnesota Supreme Court determined that the handbook did not contain sufficiently definite terms which created a binding unilateral employment contract. *Hunt v. IBM Mid America Employees Federal*, 384 N.W.2d 853 (Minn. 1986). The court contrasted the definite and specific handbook language on disciplinary procedures found in *Pine River, supra*, with the vague language on disciplinary action and discharge in the IBM employee manual and concluded that there was no definite language to constitute an offer of a unilateral contract on job termination procedures.

> Mid America's manual fails to provide any detailed or definite disciplinary procedure. The *Pine River* manual provided a definite, detailed four-step procedure. Moreover, Mid America's manual omits any definite option of a probationary period for an employee before final termination. Here there is no definite language to constitute an offer of a unilateral contract on job termination procedures.

384 N.W.2d at 857.

In the case at bar, like in *Hunt*, the language in the handbook is not definite enough to constitute an offer of a unilateral contract on job termination. The handbook does nothing more than set out six examples of dismissals for cause. Nowhere does the handbook limit the reasons for dismissal to these six provisions or state that there are any restrictions on the employer's right to discharge. The handbook provides for no disciplinary procedures short of termination nor for any grievance procedure in the event of termination. Therefore, there is no merit in Johnston's contentions that the district court erred in finding an employment at will and in finding that Johnston was not still a Co-op employee.

There is also no merit to Johnston's claim that the court erred in finding that he, as an at-will employee, could be terminated

without cause, when the Co-op had originally asserted that he resigned. A letter sent from the Co-op's attorney to Johnston's attorney on November 2, 1984, stated: "It is Coop's position that Mr. Johnston resigned his position as controller of the company." Johnston argues that the Co-op should thus be estopped from asserting that the plaintiff was terminated. Johnston cites *Mutual Benefit Life Ins. Co. v. Chisholm*, 213 Neb. 301, 306, 329 N.W.2d 103, 106 (1983), for the proposition that "[w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and a different consideration."

While this is a long-recognized rule in Nebraska, it is not applicable in the present situation. The issue in this case is whether or not Johnston's employment was terminable at will. Because the court correctly determined that Johnston was an at-will employee, it does not matter whether he resigned or was terminated. Thus, the Co-op's original contention that Johnston resigned makes no difference to the outcome of this case and is of no effect.

Johnston's final assignment of error is that the court erred in finding his discharge did not violate public policy. Johnston asserts that his discharge violated a statutory requirement that cooperative companies prepare accurate financial statements so that patronage dividends, which are based on net earnings, can be properly computed. Neb. Rev. Stat. § 21-1302 (Reissue 1983). He also asserts that his discharge violated Neb. Const. art. I, § 5, which guarantees freedom of speech, by discouraging the writing of accurate financial statements. In addition, he asserts that his discharge violated Neb. Const. art. I, § 3, which guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

Johnston cites cases from other jurisdictions that allow actions either in tort or implied contract for wrongful discharge based on violation of public policy. We discussed the public policy exception to the employment-at-will rule in *Mueller v. Union Pacific Railroad*, 220 Neb. 742, 371 N.W.2d 732 (1985):

"We recognize, however, that the 'employment at will' rule is not, in some jurisdictions, an absolute bar to a claim

of wrongful discharge. In a number of jurisdictions, an exception to the 'terminable at will' rule has been articulated in recent years. Under this exception, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy. [Citations omitted.]

So far as we are able to ascertain, Nebraska has not adopted this exception to the present time. Assuming *arguendo*, however, that such an exception were to be recognized in this jurisdiction, it is clear in this case that the plaintiff has failed in his burden to prove that his discharge was violative of a public policy of this state. We have held that '[c]ourts should be cautious in holding contracts void on ground of public policy and before they do so prejudice to the public interest should clearly appear.' *Beaver Lake Assn. v. Beaver Lake Corp.*, 200 Neb. 685, 691, 264 N.W.2d 871, 875 (1978)."

220 Neb. at 749-50, 371 N.W.2d at 737-38, quoting *Mau v. Omaha Nat. Bank*, 207 Neb. 308, 299 N.W.2d 147 (1980).

We again decline to adopt the public policy exception at this time. Assuming, but not deciding, that such an exception were to be recognized in this jurisdiction, Johnston failed in his burden to prove that his discharge was violative of this state's public policy. The discharge was not, as Johnston asserts, based on Johnston's preparation of an accurate financial statement, when his employer wanted him to prepare an inaccurate one. This is clearly shown by the fact that the Co-op incorporated the figures from Johnston's financial statement into the final yearend audit report. Johnston was not fired because of what figures he included on the financial statement, but because Johnston's supervisor believed he was violating orders.

Johnston's contention that his discharge violated due process is also groundless. In order for Neb. Const. art. I, § 3, to apply, Johnston must have had a property interest in his employment. To have a property interest in employment, a person must have a legitimate claim of entitlement to it. *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Because Johnston was an employee at will, he had no reasonable expectation of continued employment or legitimate

claim of entitlement to it.

Accordingly, it is unnecessary for us to discuss Co-op's cross-appeal.

We find no error in the judgment of the district court, and it is affirmed.

AFFIRMED.