JANET RAINS, APPELLANT AND CROSS-APPELLEE, V. BECTON, DICKINSON AND COMPANY, APPELLEE AND CROSS-APPELLANT.

523 N.W.2d 506

Filed October 28, 1994.    No. S-93-173.

Richard K. Watts, of Mills, Papik & Watts, for appellant.

Robert F. Rossiter, Jr., of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ., and BOSLAUGH, J., Retired.

CAPORALE, J.

In this wrongful termination of employment case, the plaintiff-appellant employee, Janet Rains, asserts, in summary, that the trial court erred in ruling in favor of the defendant-appellee employer, Becton, Dickinson and Company. By way of cross-appeal, the company avers that the district court erred in finding that the arrangement between Rains and the company was anything other than an employment at will. On our own motion, we removed the appeal from the Nebraska Court of Appeals to this tribunal in order to regulate the caseloads of the two courts. We now affirm.

Rains was hired on February 16, 1976, and worked at the company's Columbus, Nebraska, plant until her services were terminated on August 16, 1990, for having literally lain down on the job.

Rains testified that on the morning in question, August 11, she felt ill and, after doing some initial setup of her work area, decided that if she could rest she could finish her shift. She therefore climbed into a loft area to lie down, telling no one where she was going. After 2 to 10 minutes, she was discovered by her supervisor, whom she had not otherwise seen that day. Although the plant had no infirmary, sick employees usually reported to their supervisors and then rested in the restrooms or on benches in the break room.

In early 1986, the company had distributed to all employees of the plant a handbook entitled "Your Company and You." As

required by the company, Rains signed an acknowledgment that she had received the handbook, read it, and understood its terms.

The handbook contains information about the company, as well as procedures, guidelines, and policies. A section entitled "Disciplinary Action and Performance Documentation" sets forth a three-step system of progressive discipline for violations of company rules and regulations, as follows:

Regulations for acceptable conduct of employees are necessary for the orderly operation of any business, and for the benefit and protection of the rights and safety of its employees. From time to time, it becomes necessary to enforce the compliance of these rules and regulations.

The employee is expected to maintain proper discipline in personal standards of conduct at all times.

To ensure uniformity of rule enforcement, the following guidelines of action will generally be followed for disciplinary problems:

1. First offense - verbal warning. Explanation and verbal counseling by the supervisor. Verbal warnings will be documented by the Supervisor.

2. Second offense - written warning. A written warning records the infraction, a statement of the expected corrective action, and a statement of the consequences of any future or repeated violations. Written warnings will be prepared in triplicate with a copy to the employee, a copy to the Supervisor, and the original to the Human Resources Department where a record of all offenses will be maintained.

3. Third offense - suspension or discharge.

The above guidelines will apply in most situations; however, certain rule infractions are so serious that a written warning or even discharge must be applied. If the first offense warrants a written warning and there is a repeated infraction of the same rule within a 6-month period, the next action may be discharge. In such applications of management action, all facts and circumstances pertinent to the offense will be considered.

The introductory statement to the subsequent section,

"Rules and Regulations," provides that violations "of the following rules and regulations shall be grounds for management action." Of the 28 rules listed, 3 specifically provide that a violation will result in discharge. These three rules deal with bringing firearms to work; bringing, using, distributing, or being under the influence of intoxicants or narcotics at the workplace; and theft. Three other rules, relating to the falsification of timecards, immoral conduct, and insubordination, provide that a violation may result in discharge. Neither the rule at issue nor any of the remaining rules state that a violation may or will result in discharge. This section also provides that the rules and regulations listed "are not all inclusive. Should it be necessary to establish additional rules or policies, these will be communicated to employees."

The rule at issue reads: "LEAVING PLANT OR WORKPLACE - Permission must be obtained from your supervisor to leave the plant at any time other than lunch period or scheduled quitting time. You are not allowed to leave your assigned place of work without proper authorization, personal needs excepted."

The company's human resources director testified that after investigation, Rains' violation was considered serious enough to warrant discharge because she

> left her designated workplace; she went to a concealed area; she had no intention of being discovered; we believe she laid down; and we believe she went to sleep; and we believe she would have been there longer than 10 or 15 minutes if [her supervisor] had not woke her up.

Her actions were considered a blatant and conscious attempt to conceal herself.

We note that the company cross-appeals on the basis that the trial court found the handbook constituted a contract, but it is not at all clear that such was the case. It is true that in one portion of its written findings of fact and conclusions of law, the trial court recited that "the terms of the handbook relating to discipline are definite enough in form to constitute a unilateral contract of employment." However, immediately following that declaration, the trial court announced that "[e]ven assuming the existence of such a contract," the

language of the handbook may be such as to reserve certain discretion in the company or give it the right to amend or modify the provisions of the handbook.

The language "even assuming" seemingly contradicts the language of the sentence preceding it, which declares that the handbook constitutes a contract. Although whether a contract of employment exists is a question of law, *Johnston v. Panhandle Co-op Assn.*, 225 Neb. 732, 408 N.W.2d 261 (1987), we need not concern ourselves with the conundrum posed by the trial court's pronouncements, for assuming, but not deciding, that the language of the handbook made Rains' employment something other than at will, the company nonetheless acted within its rights.

A contract must be construed as a whole and, if possible, effect given to every part thereof. *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993). Its terms are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Murphy v. City of Lincoln*, 245 Neb. 707, 515 N.W.2d 413 (1994). A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms. *Id.*; *Baker's Supermarkets, supra.* Whether a contract is ambiguous is a question of law, *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993), as is the construction of a contract, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the lower courts, *Baker's Supermarkets, supra.*

Given those rules, the legally proper adjudication of this case is foreshadowed by our holdings in *Goodlett v. Blue Cross*, 234 Neb. 5, 449 N.W.2d 9 (1989), and *Johnston, supra.*

In *Goodlett*, by declaring that the provisions of that defendant's handbook could have become part of the employee's otherwise oral contract of employment, we assumed the existence of a contract of employment specifying a four-step progressive system of discipline. The first step provided for an oral warning, the second for a written warning, and the third

for a period of probation. While the opinion does not detail the discipline contemplated by the fourth step, it does reveal that the employee's services were terminated. The employee complained that she had been given no oral warning. We ruled that by providing that " '[i]f the offense is of a very serious nature and requires immediate action, the manager is not required to go through Steps 1 and 2,' " the assumed contract "permit[ted] the employer to modify its disciplinary procedure in appropriate circumstances." *Id*. at 10, 449 N.W.2d at 12.

In *Johnston*, we concluded that a handbook which set a future salary, stated that after a defined period of probationary status employment would be permanent, and specified six examples of cause for dismissal did not create an arrangement for anything other than at-will employment.

Here, only approximately 10 percent of the rules contained in the rules and regulations section of the handbook specifically provide that their violation will result in discharge; however, the "Disciplinary Action and Performance Documentation" section of the handbook does not specify that the three-step system of progressive discipline will always be used, only that generally it will be applied. Moreover, that section recites that "guidelines" in the handbook will apply not in all circumstances, but only "in most situations" and that "certain rule infractions are so serious" that discharge must be the penalty. The handbook further provides that the rules and regulations listed are not all-inclusive. Although the handbook provides that additional rules or policies adopted will be communicated to employees, it does not specify that such will be done before implementation.

Thus, like the employers in *Goodlett* and *Johnston*, the company retained the discretion to modify its disciplinary procedure at will, thereby reserving the right to discipline as it saw fit and to determine that particular conduct was sufficiently severe as to warrant discharge. In such a situation, the company need not first resort to either of the other two less severe sanctions.

Indeed, the handbook language here was even more discretionary than the handbook language in *Johnston*, for the *Johnston* language contained no suggestion that the rules were

not all-inclusive, nor did the *Johnston* handbook provide that the guidelines specified would apply in only most situations or that certain rule infractions are so serious that a discharge must be applied.

Consequently, since the company found the infraction to be serious, it had the right to discharge Rains the first time she violated the rule against leaving her assigned place of work without first obtaining proper authorization. The judgment of the trial court, being correct, is affirmed.

AFFIRMED.

WHITE, J., concurring.

Reluctantly, I agree with the result announced by the majority. It is a cruel fact of employee life: That which the employer grants with the one hand is easily taken away by the other. The vague promises of clear standards and fair procedure are merely puffing. The simple fact is that when the employer determines to fire an employee, in general, it may do so if the option to disregard the procedure is reserved or if it is announced that the pamphlet does not constitute a contract.

LANPHIER, J., joins in this concurrence.